**Robert Charles JORDAN, Jr., Plaintiff,**

v.

**C. J. FITZHARRIS et al., Defendants.**

**No. 44786.**

United States District Court
N. D. California, S. D.

Sept. 6, 1966.

Charles B. Cohler, San Francisco, Cal., for plaintiff.

Thomas C. Lynch, Atty. Gen. of California, by Robert R. Granucci, John Oakes, Deputy Attys. Gen., for defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE B. HARRIS, Chief Judge.

This is a civil rights action in which the plaintiff claims to have been unconstitutionally subjected to cruel and unusual punishment. The action is brought under 42 U.S.C. §§ 1981, 1983, 1985(3) and 1986; the Court's jurisdiction is had under 28 U.S.C. §§ 1331 and 1343. Plaintiff prays for injunctive and monetary relief.

Plaintiff Robert Charles Jordan, Jr., is an inmate of the California Correctional Training Facility at Soledad. Named as defendants are the State of California, the Correctional Training Facility at Soledad, the Director of Corrections of the State of California, the Superintendent of the facility at Soledad, and various subordinate officials at Soledad.[1]

The action was initially begun by the plaintiff acting on his own behalf and proceeding in forma pauperis. Thereafter, the court appointed Charles B. Cohler, Esq., of San Francisco, to represent Mr. Jordan in all further proceedings. Mr. Cohler's commendable zeal and devotion to the cause of the indigent

---

1. The court reserved ruling on a defense motion to dismiss the action as against the State of California and the Correctional Training Facility at Soledad. Desirable though it might be to have injunctive relief run against the state and the institution, it is apparent that they are not proper parties to this action. See

Monroe v. Pape, 365 U.S. 167, 187–192, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Williford v. People of State of California, 352 F.2d 474, 476 (9th Cir. 1965); United States ex rel. Lee v. People of State of Illinois, 343 F.2d 120 (7th Cir. 1965).

plaintiff in large measure made possible the successful result.

Plaintiff's cruel and unusual punishment contention arises out of his confinement from July 9 until July 20, 1965, in a so-called "strip cell" at Soledad. The strip cells (6 in number) form part of the isolation section of the prison's maximum-security Adjustment Center.[2] Each strip cell measures approximately 6′–0″ by 8′–4″. The side and rear walls are solid concrete, as is the floor. The front wall is constructed of steel bars covered by a metal screen. Access is gained through a sliding barred door. A second front wall is located 2′–10″ from the barred wall, thus forming a kind of vestibule between the cell proper and the corridor. Set into this otherwise solid wall are a 24″ x 36″ barred and screened window opening and a hinged steel door with a 12″ x 18″ barred and screened window opening. The window openings in this outer wall and outer door can be closed off by means of a metal flap which is hinged at the bottom of each window and can be swung up and latched at the top of the window opening. Immediately outside of this outer wall is an 8′–7½″ wide corridor which runs past the six strip cells, through a barred barrier with a locked door, past the eighteen isolation cells, through a "sally port" (a small rectangular, barred enclosure having two locked doors) and into another corridor where it terminates. In this latter corridor is located the officers' area. Thus the strip cells are placed at the opposite end of the wing from the officers' area and an officer must pass through three locked doors to get from his area to the strip cells. Across the corridor from the strip cells is the outer wall of the wing. This wall has barred windows which formerly contained glass but now are partially covered by sheet metal.

The interiors of the strip cells are entirely devoid of furnishings except as follows: Four of the strip cells have an ordinary commode toilet encased in concrete. The remaining two strip cells have a so-called "Oriental" toilet, i. e., a hole in the floor.[3] None of the toilets can be flushed by the occupant of the cell, but must be flushed from outside the cell by an officer or an inmate porter. The flushing mechanism is located in a tunnel immediately behind the row of strip cells.

Heat and ventilation are supplied to the strip cells through two ducts located high on the rear walls of the cells. The cells have no interior source of light. When the flaps on the outer wall are closed the cells are totally dark except for such light as may seep in through the cracks around the flaps and the outer door.

The strip cells, as described above, are the most secure and have the least facilities of any cells in the facility at Soledad. They represent the most extreme form of confinement the institution has to offer.

Plaintiff testified, and the records indicate, that he was placed in a strip cell on the evening of Friday, July 9, 1965. He remained continuously in the cell until the morning of Tuesday, July 20, 1965, except for a brief period on Tuesday, July 13, when he was removed from the cell, taken to a hearing before the Disciplinary Committee, and returned to the cell.

The amended complaint filed by Jordan, through his appointed counsel, particularized his grievances and charged substantially as follows:

On or about July 9, 1965, plaintiff was placed in a special punishment unit at the Correctional Training Facility, known as a "strip cell" (hereinafter referred to as "strip cell"). Plaintiff was continuously confined in solitary confinement in said strip cell for twelve consecutive days.

---

2. See photographs appended to this Opinion.

3. The cell in which plaintiff was confined during the period of time which forms the basis of this action was one of the four strip cells having a commode toilet.

\* \* \* \* \* \*

During plaintiff's confinement in said strip cell, plaintiff was forced to remain in said strip cell with said flaps and door of the second wall closed. As a result, plaintiff was deprived of light and ventilation for twelve days, except that twice a day the door of the second wall was opened for approximately fifteen minutes.

The interior of said strip cell is without any facilities, except that there is a raised concrete platform at the rear of the cell containing a hole to receive bodily wastes. There is no mechanism within the cell for "flushing" bodily wastes from this hole. "Flushing" is controlled by personnel of the Correctional Training Facility from the exterior of said strip cell. The hole was only "flushed" at approximately 8:30 a. m. and 9:00 p. m. on some of the twelve days plaintiff was confined in said strip cell.

During plaintiff's confinement in said strip cell, the strip cell was never cleaned. As a result of the continuous state of filth to which plaintiff was subjected, plaintiff was often nauseous and vomited, and the vomit was never cleaned from the plaintiff's cell. When plaintiff was first brought to the strip cell, the floor and walls of the strip cell were covered with the bodily wastes of previous inhabitants of the strip cell. Plaintiff is informed and believes and on that basis alleges that said strip cell had not been cleaned for at least thirty days before plaintiff was confined therein.

Plaintiff was forced to remain in said strip cell for twelve days without any means of cleaning his hands, body or teeth. No means was provided which could enable plaintiff to clean any part of his body at any time. Plaintiff was forced to handle and eat his food without even the semblance of cleanliness or any provision for sanitary conditions.

For the first eight days of plaintiff's confinement in said strip cell, plaintiff was not permitted clothing of any nature and was forced to remain in said strip cell absolutely naked. Thereafter, plaintiff was given a pair of rough overalls only.

Plaintiff was forced to remain in said strip cell with no place to sleep but upon the cold concrete floor of the strip cell, except that a stiff canvas mat approximately 4½ feet by 5½ feet was provided. Said mat was so stiff that it could not be folded to cover plaintiff without such conscious exertion by plaintiff that sleep was impossible. Plaintiff is six feet and one inch tall and could not be adequately covered by said stiff canvas mat even when holding said mat over himself. The strip cell was not heated during the time that plaintiff was forced to remain there.

Plaintiff is informed and believes and on that basis alleges that plaintiff has been and may be subjected to confinement in said strip cell without the authorization of the Superintendent, the Deputy Superintendent, the Associate Superintendent, or anyone of comparable administrative rank; that lower-rank personnel of the Correctional Training Facility purport to have exercised and intend to exercise in the future broad discretion in confining plaintiff in said strip cell; that said lower-rank personnel purport to have the discretion to confine plaintiff in said strip cell for 60 consecutive days; and that there are no standards for the proper exercise of such discretion.

On many occasions prior to July 9, 1965, plaintiff has been confined in said strip cell, plaintiff is continually living under the threat of repeated confinement in said strip cell, and plaintiff is constantly subject to confinement in said strip cell pursuant to purported disciplinary procedures as they presently exist and will continue to exist unless enjoined by this Court.

Plaintiff has been denied adequate medical care prior to, during, and subsequent to said confinement in said strip cell, despite repeated oral and

written requests for same made in good faith by or on behalf of plaintiff.

Prior to and subsequent to said confinement in said strip cell, plaintiff has been forced to endure confinement in "O Wing" of the Correctional Training Facility without adequate protection from the raw outdoor elements, in that plaintiff's cell front offers no protection from the elements, being only bars, there are no window panes for the large window openings in the outside wall of the corridor which is directly outside plaintiff's cell, and there is insufficient artificial heat, if any, to combat the outdoor climatic conditions which prevail in plaintiff's cell.

Jordan, called as a witness on his own behalf, gave testimony which fortified the foregoing allegations. He testified categorically concerning the practices engaged in by the defendants. He was subjected to a lengthy and searching cross-examination by the two attorneys representing the defendants. His testimony is clear and convincing. (Tr. p. 368, et seq.)

More particularly, Jordan discharged the burden cast upon him with respect to the period of time he was confined in the strip cell; the fact that he was deprived of clothing for the period of time, at least for seven days; that he was required to sleep on a strong blanket ill adapted to the uses for which it was put; that the flaps were closed practically all of the time thus depriving him of both light and adequate ventilation in the cell; that the elements of cleanliness were likewise deprived him, to-wit, water, soap, towel, tooth brush, toothpaste, implements for cleaning the cell, and shower. (Tr. p. 378, et seq.)

It is evident from the foregoing narrative of Jordan's testimony that he was required to eat the meager prison fare in the stench and filth that surrounded him, together with the accompanying odors that ordinarily permeated the cell. Absent the ordinary means of cleansing his hands preparatory to eating, it was suggested by the prison consulting psychiatrist, Dr. Hack, that he might very well use toilet paper for this purpose plus his small ration of water, being two cups a day. (Tr. p. 597)

Regarding medical care: Jordan requested from time to time medical assistance through the medical officer, Dr. Kunkel. As evidence of the limited medical care provided, the official records demonstrate that Dr. Kunkel came into the wing where the strip cells are located and spent eight minutes on one occasion and ten minutes on another occasion, thus servicing the one hundred and eight inmates.[4]

On behalf of the plaintiff, the following inmate witnesses were called: Alfonso Esparza, Herman Alexander, Melvin Allison, Wendell Harris, Siegfried Porte and Warren Wells.[5]

At the request of the State the testimony of the foregoing witnesses was taken at the Soledad Facility, with the exception of Wells who is on parole and was heard in the courthouse in San Francisco.

It is to be observed that the inmates and their testimony were subjected to vigorous and searching cross-examination. Notwithstanding such scrutiny, the narratives contain the essentials of truth and are credible and convincing.

The Court during the course of the proceedings heard the following witnesses presented by the defendants: Dr. Edward Kunkel, Chief Medical Officer at Soledad; Robert Donnelly, Deputy Superintendent at Soledad; Dr. Raymond Hack, Psychiatric Consultant at Soledad; Terry Caldwell, Correctional Officer; Raul Mata, Correctional Officer; John Nash, Correctional Officer; George

---

4. Plaintiff's Exhibit No. 12.

5. It may be observed parenthetically that Esparza and Wells were subjected to 58 days in the strip cell with continuity, save four days' removal over the Thanksgiving holiday.

Esparza refused to turn over his coveralls. He testified that as a result he was shot in the face with a tear gas gun.

Johnston, Program Administrator; Alfred DeCarli, Correctional Counselor; Clemett Swagerty, Associate Superintendent; William Kiepura, Correctional Counseler; Robert Hoagland, formerly a Correctional Officer at Soledad, now a Correctional Program Supervisor at another institution; William Friedrick, Correctional Sergeant; Roland Lovett, Chief Engineer; and Cletus Fitzharris, Superintendent.

The trial itself, represented an intensely human drama of some precedential value. It may be noted that this is the first occasion that the United States District Court in this Circuit has undertaken to inquire into the procedures and practices of a State penal institution in a proceeding of this kind.

■ The legal principles applicable are not in serious dispute. The Cruel and Unusual Punishment clause of the Eighth Amendment is applicable to the states through the Due Process clause of the Fourteenth Amendment. Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The Civil Rights Act, 42 U.S.C. § 1983, creates a cause of action for deprivations, by persons acting under color of state law, of rights secured by the Constitution. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Persons confined in state prisons are within the protection of 42 U.S.C. § 1983. See Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Weller v. Dickson, 314 F.2d 598 (9th Cir. 1963); Stiltner v. Rhay, 322 F.2d 314 (9th Cir. 1963). The right to be free from cruel and unusual punishment is one of the rights that a state prisoner may, in a proper case, enforce under § 1983. Talley v. Stephens, 247 F.Supp. 683 (E.D. Ark.1965); United States ex rel. Hancock v. Pate, 223 F.Supp. 202 (N.D.Ill. 1963); Redding v. Pate, 220 F.Supp. 124 (N.D.Ill.1963); Gordon v. Garrson, 77 F.Supp. 477 (E.D.Ill.1948); Lee v. Tahash, 352 F.2d 970, 972 (8th Cir. 1965) (Dictum).

■■ "What constitutes a cruel and unusual punishment has not been exactly decided." Weems v. United States, 217 U.S. 349, 368, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910). This statement is as true today as it was in 1910. It is possible, however, to identify three general approaches to the question. See Rudolph v. Alabama, 375 U.S. 889, 890–891, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963), (dissenting opinion of Goldberg, J.). The first approach is to ask whether under all the circumstances the punishment in question is "of such character * * * as to shock general conscience or to be intolerable to fundamental fairness." Lee v. Tahash, supra, 352 F.2d at page 972. Such a judgment must be made in the light of developing concepts of elemental decency. Weems v. United States, supra, 217 U.S. at 378, 30 S.Ct. 544; Trop v. Dulles, 356 U.S. 86, 100–101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (opinion of Warren, C. J.); Rudolph v. Alabama, supra, 375 U.S. at 890, 84 S.Ct. at 155 (dissenting opinion of Goldberg, J.). Secondly, a punishment may be cruel and unusual if greatly disproportionate to the offense for which it is imposed. Weems v. United States, supra; Robinson v. State of California, supra, at 676, 82 S.Ct. 1417, 8 L. Ed.2d 758 (concurring opinion of Douglas, J.); Rudolph v. Alabama, supra, 375 U.S. at 891, 84 S.Ct. at 155 (dissenting opinion of Goldberg, J.). Finally, a punishment may be cruel and unusual when, although applied in pursuit of a legitimate penal aim, it goes beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used. Weems v. United States, supra, 217 U.S. at 370, 30 S.Ct. 544; Robinson v. California, supra, 370 U.S. at 677, 82 S.Ct. 1417 (concurring opinion of Douglas, J.); Rudolph v. Alabama, supra, at 891, 84 S.Ct. at 155 (dissenting opinion of Goldberg, J.).

Defendants contend that the use of the "strip" or "quiet" cell is warranted in eliminating so-called "incorrigible" inmates from the rest of the inmates in the institution; that fighting, physical violence, throwing objects, vile, abusive and threatening language and epithets, some-

times coupled with overt conduct, call for stringent, strong and protective measures.

It is further contended by the defendants that the strip cells are used both as a preventive and punitive device. In some instances, it is pointed out, inmates with suicidal tendencies are incarcerated in such cells in order to prevent them from doing physical harm, either to themselves or to others. It may be noted that several inmates in the said strip cells were able to accomplish and consummate the suicide.

It appears that the cells in question were used to house those who are assertedly beyond the reach of ordinary controls and prison directives.

■ Usually the administrative responsibility of correctional institutions rests peculiarly within the province of the officials themselves, without attempted intrusion or intervention on the part of the courts. See, e. g., Hatfield v. Bailleaux, 290 F.2d 632, 640 (9th Cir. 1961); Childs v. Pegelow, 321 F.2d 487, 489 (4th Cir. 1963); United States ex rel. Knight v. Ragen, 337 F.2d 425 (7th Cir. 1964).

■ However, when, as it appears in the case at bar, the responsible prison authorities in the use of the strip cells have abandoned elemental concepts of decency by permitting conditions to prevail of a shocking and debased nature, then the courts must intervene—and intervene promptly—to restore the primal rules of a civilized community in accord with the mandate of the Constitution of the United States. Cf. Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.1965); Fulwood v. Clemmer, 206 F.Supp. 370 (D.D.C.1962); Gordon v. Garrson, 77 F.Supp. 477, 479–480 (E.D.Ill.1948); Lee v. Tahash, 352 F.2d 970, 972 (8th Cir. 1965). See generally, Edwards v. Duncan, 355 F.2d 993, 994 (4th Cir. 1966); Redding v. Pate, 220 F.Supp. 124, 126–128 (N.D.Ill.1963); United States ex rel. Hancock v. Pate, 223 F.Supp. 202, 204–205 (N.D.Ill.1963); Comment, 72 Yale L.J. 506 (1963).

■ In the opinion of the court, the type of confinement depicted in the foregoing summary of the inmates' testimony results in a slow-burning fire of resentment on the part of the inmates until it finally explodes in open revolt, coupled with their violent and bizarre conduct. Requiring man or beast to live, eat and sleep under the degrading conditions pointed out in the testimony creates a condition that inevitably does violence to elemental concepts of decency.

The testimony further reflects that the security officers made no effort to remedy the situation, notwithstanding persistent and violent complaints on the inmates' part.

However, within recent date, and coincidental with the filing of the several actions herein by plaintiff, certain remedial conditions were established and maintained as hereinafter set forth.

Superintendent Cletus J. Fitzharris, Deputy Superintendent Robert Donnelly, Sergeant William T. Friedrick, and George F. Johnston are essentially dedicated career men. It should be observed that every courtesy was extended to the court and to its attachés in connection with the inquiry conducted at the Soledad facility. Further, that all records requested by the court or counsel were made available. However, there is a note of futility that seems to run through the pattern of their testimony. Superintendent Fitzharris commented as follows:

Q. And would you say that the quiet cells described in your direct examination is a proper means of such control of noise?

A. I don't know. I just don't know what is the proper means. The best we have so far.[6]

\*　\*　\*　\*　\*　\*

A. I don't know, but I certainly—nobody's happy with having to treat human beings like this, but some hu-

6. Tr. p. 256, l. 16–20.

man beings can't be treated otherwise, that we know of.[7]

The futility may well have been generated as the result of understaffing and a lack of adequate personnel to service the Adjustment Center and the strip cells.

The memorandum from Assistant Superintendent Donnelly to Superintendent Fitzharris dated April 12, 1966, marked Plaintiff's Exhibit No. 16, gives confirmation to the problems implicit in understaffing:

Those complaints which have come to our attention have emanated from the Adjustment Center, "O" and "X" wings, Central Facility. Without belaboring the point, some of the most hostile and dangerous inmates within the Department of Corrections are housed in these wings. In addition, *these wings are understaffed and the men on lockup status receive little in the way of any kind of individual attention which, no doubt, increases their anger and complaints.* (Italics ours)

At this juncture it should be observed that the Supreme Court of the State of California, through an unidentified Associate Justice, made inquiry of Administrator Richard A. McGee (and thence, of Director Dunbar) concerning certain questionable practices in view of accusations made by an inmate concerning treatment in the disciplinary unit.[8] It may be inferred, and it is certainly not denied, that the inquiry was coincident with the petitioner's application before the Supreme Court for a writ.

As a result of this inquiry the court requested the production of any and all memoranda and documents bearing upon the same. Superintendent Fitzharris submitted memoranda which have been marked in evidence as Plaintiff's Exhibits Nos. 14, 15 and 16. The memoranda are especially revealing as they bear upon the questionable practices more particularly alleged by plaintiff Jordan.

In the memorandum from L. M. Stutsman, Chief Deputy Director, to All Wardens, dated February 1, 1966, the following appears:

Recently this entire matter was brought to the Director's attention through a writ submitted by an inmate in which many accusations were made concerning treatment in the disciplinary unit. The writ was denied by the court. Review however indicated some questionable practices which have been corrected with respect to strict adherence to rules and regulations. This memorandum is written to remind you again that each warden or superintendent must personally see to it that rules and regulations and procedures involving inmate discipline are strictly followed. It is considered part of the job of a warden or superintendent to not only keep himself informed in this area via reports and contacts with his staff, but also through first hand knowledge by visiting the disciplinary areas in his institution.

Further, in the memorandum submitted by Superintendent Fitzharris to the attention of Director Dunbar dated April 13, 1966, recognition is given to the plaints and grievances submitted by petitioner:

In addition to items contained in Mr. Donnelly's report, I should point out that we have installed an automatic flushing device for the oriental toilets in the strip cells. This eliminates the possibility of staff becoming involved in other matters and not flushing the toilets with regularity. *Provisions have been made for water and personal hygiene materials to be available to the inmates in strip cells so that personal hygiene may be maintained. I apologize for the delay in the report.* (Italics ours)

It is manifest from the foregoing excerpts, as well as the surrounding testimony, that certain radical changes and revisions were made in the practices surrounding incarceration in the strip cells. Whether the changes were made

---

7. Tr. p. 258, 1. 5–7.

8. Tr. pp. 477–478.

682

as a result of the petition filed in this court or before the Supreme Court is immaterial. It is fairly inferable that the revisions and corrections were made in meeting the criticism generated by the plaintiff's application before the Supreme Court of the State of California. The defendants deny that the revisions and corrections resulted from such inquiry and seemingly contend that they were to some extent spontaneous. The court is not inclined to this view.

■ It is perfectly apparent to this court that whether a man is confined in a strip cell, or in solitary confinement, he is entitled to receive the essentials for survival. The essentials for survival necessarily include the elements of water and food and requirements for basic sanitation.

The defendants themselves have given recognition to these basic requirements under the apparent compulsion of their directors and superior officers. It appears from the testimony that an inmate so incarcerated now receives a basin, pitcher of water, towel, tooth brush and toothpaste, toilet tissue, and is permitted to shower once a week.

The graphic testimony of the psychiatrist, Dr. Raymond L. Hack, fully exemplifies the reasons for supplying the said basic requirements. His testimony reads, in part, as follows:

THE COURT: All right, Doctor, will you pause for a moment and consider yourself inside one of the cells in question with the flaps up. Do you concede that there isn't any light in the cell, Doctor?

THE WITNESS: Yes.

THE COURT: It is absolutely dark.

THE WITNESS: Not quite, because these are not, as the so-called solitary confinement cells of former years where there was no light. There is a slight seepage of light.

THE COURT: Very slight.

THE WITNESS: Very slight.

THE COURT: Mindful of the conditions under which a man is confined in a cell in question, how do you propose he maintain his personal bodily cleanliness, his hands and the like?

THE WITNESS: He is provided with—is provided with the toilet tissue. He is supposed to be removed to be—he is supposed to be removed to be showered.

THE COURT: When? And how often?

THE WITNESS: I believe at least every five days was the minimum.

THE COURT: So for a period of five days, at least, his body, if he is stripped, and his hands equally, would be the subject of some degree of contamination. Isn't that correct?

THE WITNESS: Yes, but as—

THE COURT: Is it correct, Doctor, or is it not?

THE WITNESS: For a period of five days he possibly might be quite soiled.

THE COURT: Yes. And quite contaminated.

THE WITNESS: Yes.[9]

THE COURT: Let's confine ourselves to the cell in question, to the degree of light, to the lack of cleanliness, to the lack of apparent facilities for a man to either bathe or wash his hands. I address the question again to you, Doctor, mindful of your constant surveillance over these cells or at least casual surveillance: Did you at any time during the course of your career make a recommendation regarding any device or facility that might be used by the inmate?

THE WITNESS: No devices or facilities. I have made the recommendation that he ought to be taken out and cleaned one way or another.

THE COURT: That the inmate ought to be taken out?

9. Tr. p. 597, 1. 8, to p. 598, 1. 13.

THE WITNESS: That the inmate ought to be taken out and the cell should be cleaned.

THE COURT: Was that prompted by a physical observation you made of any inmate?

THE WITNESS: Yes.

THE COURT: Will you state the name or identity of the inmate.

THE WITNESS: I don't know.

THE COURT: What was the condition of his body?

THE WITNESS: If I entered a cell and the cell smelled badly, I feel this is an unhealthful situation. As was made an effort at CMF, as I have alluded—

THE COURT: Is it not true, notwithstanding the stench or smell, many of these inmates were permitted to and forced to eat their meals in that stench and odor?

THE WITNESS: I don't know as they were forced to. It is true that if they were going to eat, that they might have to eat under those circumstances.[10]

* * * * * *

Plaintiff requests that defendants be enjoined permanently from subjecting plaintiff to violations of 42 U.S.C. §§ 1981, 1983, 1985 and 1986.

This relief should be granted, save and except as to Sections 1985 and 1986, for, as it appears in the case at bar, there has been no evidence that plaintiff has been denied equal protection of the laws such as is required by Sections 1985 and 1986, supra.[11]

If the defendants intend to continue with the use of the so-called "strip" or "quiet" cell as a device in the general plan of solitary confinement, then its use must be accompanied by supplying the basic requirements which are essential to life, and by providing such essential requirements as may be necessary to maintain a degree of cleanliness compati-

ble with elemental decency in accord with the standards of a civilized community.

While the court will not undertake to specify the precise procedures which the officials must adopt if they are to meet the demands of the Constitution, the practices set out in the manuals relied upon by defendants would, if adopted and followed, meet the minimum standards required by the Eighth Amendment.

The following excerpts are illustrative:

c) *Punitive segregation in a special punishment section or building.* This section is usually not a part of the regular living quarters. Inmates confined in this area usually receive a restricted diet and a loss of privileges. They should be in a punishment status and kept there for comparatively brief periods. Ordinarily no inmate should be retained in punitive segregation on restrictive diet more than fifteen days, and normally a shorter period is sufficient. Those who fail to make an adjustment under such conditions can often be treated more effectively in special administrative segregation facilities. The punitive segregation section should not be utilized for indefinite or permanent segregation. The not uncommon practice of confining insane inmates there is indefensible, all insane inmates should be transferred to a mental hospital or medical-psychiatric treatment facility.

*The punitive segregation section and all the cells in it should be evenly heated and adequately lighted and ventilated. Artificial ventilation is usually necessary. High sanitary standards should be maintained, bathing facilities should be provided in the section and inmates permitted to bathe frequently. Most of the cells should contain a washbowl and toilet. It is necessary to omit this equipment from a few cells and assign them to inmates who persist in misusing the plumbing facilities. A few cells may have toilets*

---

10. Tr. p. 599, 1. 24 to p. 601, 1. 4.

11. Collins v. Hardyman, 341 U.S. 651, 661, 71 S.Ct. 937, 95 L.Ed. 1253 (1951);

Joyce v. Ferrazzi, 323 F.2d 931, 932–933 (1st Cir. 1963).

*that can be flushed only by the officer from outside the cell; these are either ordinary seat toilets or "Oriental type" toilets, which are openings level with the floor. Toilets which the occupant of the cell cannot flush need constant supervision by the officer. Wholly dark cells should not be used and if there is a solid door on the cell, it should be so designed that it does not exclude all light. Natural or artificial lighting should be provided during normal hours of the day or evening in keeping with standards for regular living quarters.* (Italics ours)

Punitive segregation cells should be so constructed that all parts are visible to the patrolling officer from the corridor. Such cells or at least some of them should be soundproofed for obvious reasons. Doors may be hollow with insulation in the hollow spaces. All efforts possible should be made to prevent the transmission of sound to the outside through ventilating shafts, ducts, etc.

Normally, inmates are not confined in cells with solid doors or placed on restricted diet unless they have created a disturbance while confined in standard cells in the segregation section. Occasionally they are put in cells of this type to prevent communication with other prisoners or to minimize noise from disturbances. Some institutions have solid fronts on all punishment cells, using wire glass or glass brick to admit some natural light and providing ample mechanical ventilation. The use of double doors with open grill gates supplemented by solid front doors, makes it possible to maintain better observation by leaving solid doors open except when necessary to control the noise of a disturbed or unruly inmate for temporary periods.

View ports or windows of tempered glass should be provided in such cells to permit good supervision and to prevent mutilation or suicide.[12]

The same housekeeping procedures will apply to the Adjustment Center as obtain in the general institution, except for disturbed and destructive inmates who will be handled as the situation indicates. This includes regular change of bedding, clothing, bathing and feeding.[13]

Defendants of recent date, have undertaken to install certain basic essentials, i. e., a basin, pitcher of water, towel, tooth brush, toothpaste, toilet tissue, and automatic toilet flushes.

The injunctive relief contemplated should embrace at least the foregoing revisions in practice, and such others as may be compatible with the constitutional mandate proscribing against cruel and unusual punishment with particular reference to the foregoing excerpts from the rules and regulations.

The Court has considered plaintiff's request that damages be assessed against the defendants. Such request is denied.

The Court has concluded that the ends of justice will be served by the issuance of injunctive relief, as prayed, together with any and all costs laid out and expended on behalf of the above named plaintiff Jordan by his appointed counsel, Charles B. Cohler.

In view of the court's foregoing disposition granting injunctive relief, the petition for the writ of habeas corpus (No. 44309) will be dismissed coincident with the filing of the within memorandum opinion and order.

Findings, decree and injunctive relief may be prepared consistent with the foregoing.

---

12. Defendants' Exhibit E, Manual of Correctional Standards, The American Correctional Association, Third Edition, 1966, pp. 414–15. This manual, although assertedly not binding on the defendants, was introduced in evidence by them as an illustration of what is considered good practice, and defense counsel pointed out that the manual was largely written by California penal authorities.

13. Inmate Classification Manual, State of California Department of Corrections, Ch. V, § 01(e), May, 1961.