Johnny MURPHY, Plaintiff,

v.

Travis WHEATON et al.,
Defendants.

No. 74 C 405.

United States District Court,
N. D. Illinois, E. D.

Sept. 20, 1974.

Johnny Murphy, pro se.

William J. Scott, Atty. Gen., State of Ill., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

WILL, District Judge.

The plaintiff, an inmate at the Illinois State Penitentiary, Joliet, brings this action for declaratory, injunctive, and monetary relief under 42 U.S.C. §§ 1983 and 1985(3). This court's jurisdiction is based on 28 U.S.C. § 1343(3). The plaintiff's claims for relief are based upon the following allegations set out in his complaint.

Beginning September 6, 1973, the plaintiff was confined to his cell twenty-four hours daily for a period of 187 days during which entire time he was allowed only three showers, no outdoor exercise, no shaves, no haircuts and no access to the prison's educational programs. This confinement followed a riot on September 6 in which nine prison guards were tied, blindfolded, and held as hostages in cell-house B by inmates. During the incident, the hostages were locked in several cells while the cell doors of over 300 inmates were unlocked and the inmates freed, allowing them to wander around the prison premises. On the evening of September 6, the hostages were freed and the inmates restored to their respective cells. Prison officials immediately instituted a general lock-up.

On December 2, 1973, plaintiff, Johnny Murphy, was released from his cell for the first time since the initiation of the lock-up to appear before the Disciplinary Committee consisting of three prison officials. He was informed that he had been identified as a member of the B–House revolt and that he had been seen carrying weapons on that day. The plaintiff requested and was denied the opportunity to question the accusing officers and to call witnesses to testify on his behalf. The Disciplinary Committee prescribed fifteen days of isolation, already served beginning September 6, as punishment for plaintiff's activities.

Murphy was transferred from the Disciplinary Committee to the Assignment Committee where he was assigned to Segregation without being afforded the opportunity to call witnesses and to question his accusers. He remained in segregation for 100 days (December 2, 1973 to March 13, 1974).

Similar proceedings were held with respect to the other 300 inmates involved in the incident of September 6. These resulted, plaintiff alleges, in the confinement to Segregation of approximately fifty black and one white inmate.

Plaintiff appeared before the Merit Staff January 23, 1974, where he was informed that he would be demoted and denied statutory good time. He again requested and was denied the opportunity to call witnesses and to question his accusers.

Plaintiff allegedly was not allowed outdoor exercises, was confined to his cell twenty-four hours per day, and was allowed only three showers during this period of confinement. Additionally, he is allegedly currently suffering constant drowsiness and headaches.

Based on the above facts, the plaintiff makes the following claims: 1) the denial of an opportunity to call witnesses and to question his accusers before the Prison Disciplinary Committee, Assign-

ment Committee, and Merit Staff constituted violations of his constitutional right to procedural due process; 2) the confinement of fifty blacks and one white to Segregation was a denial of equal protection, when fifty whites and 250 blacks, he alleges, engaged in the same activity; 3) the conditions of plaintiff's confinement constituted cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. Additionally, the plaintiff seeks injunctive relief against the defendants' alleged practice of writing a "multitude of false discipline reports" on the plaintiff as well as other inmates who file suits in the federal courts.

## I

The defendants have moved for dismissal of due process allegations and the equal protection claim for failure to state a cause of action or for summary judgment if such claims are considered on the merits, and for dismissal of the cruel and unusual punishment allegation for failure to state a claim upon which relief can be granted.

Plaintiff puts forth two due process claims resulting from his confinement from September 6, 1973 to March 13, 1974. The first is based on his twenty-four hour daily confinement from September 6 to December 2 without advance notice and a hearing; the second is founded upon the denial of an opportunity to call witnesses and cross-examine his accusers before the Disciplinary, Assignment, and Merit Committees.

■■ It is well-settled that prisoners retain the protections of the Due Process Clause. Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, Decided June 26, 1974; Miller v. Twomey, 479 F.2d 701 (7th Cir. 1973); Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970). The nature of incarceration imposes certain restrictions on the scope of due process protection, however, and the Seventh Circuit has held that, with respect to disciplinary proceedings, the Constitution requires only advance writ-

ten notice of the proceeding, a dignified hearing in which the accused may be heard, an opportunity to request that other witnesses be called or interviewed, and an impartial decision-maker. Miller v. Twomey, *supra,* 479 F.2d at 716.

■ The plaintiff's challenge to his daily twenty-four hour confinement between September 6 and December 2 without advance notice and a hearing could prevail under a literal interpretation of the *Miller* holding. As reflected in the following language, that decision stands for the broad proposition that an accommodation must be reached between institutional needs and objectives and the constitutional due process mandate:

> Nevertheless, it does not inevitably follow that procedural safeguards must apply wherever an inmate is removed from the general population. Before such a conclusion is justified in any given set of circumstances, there must be an identification of the precise nature of the government interest as well as the private interest affected. . . . A good faith determination that immediate action is necessary to forestall a riot outweighs the interest in accurate determination of individual culpability before taking precautionary steps. Miller v. Twomey, *supra,* at 717.

The confinement of the plaintiff and the other inmates who were out of their cells during the incident of September 6, was the institution's response to circumstances that threatened the security of the prison complex. The accommodation proposed in Miller v. Twomey, *supra,* might, in the circumstances, operate to suspend the minimum requirements set out in *Miller.*

The court in Burns v. Swenson, *supra,* faced with a challenge to the placing of an inmate in segregation prior to hearing, held the following:

> The Constitution does not require that every inmate must in every instance be given a formal hearing prior to segregation in maximum security. This course of procedure although de-

sirable, is not always practical. The exigencies of unusual or emergency situations dictate that an inmate be unilaterally segregated first, with a hearing provided later. . . . Here, a violent stabbing and several contemporaneous assaults manifesting racial hatred among the inmates had occurred. The prison authorities apparently had reason to believe that Burns and other inmates had participated in the incident. Exigent circumstances known only to the prison officials may have required the foregoing of any hearing at the time of Burns' segregation. The remaining delay must have related to the necessities of investigation of the incident and the continued tension in the prison. We cannot hold that the six month delay before Burns' case was reviewed and he was allowed a hearing amounts per se to a deprivation of any constitutional right. Burns v. Swenson, *supra,* 430 F.2d at 779.

■ A prison riot is certainly as grave a circumstance as the stabbing and assaults which lead to the segregation of Burns for a six months period prior to his hearing. Furthermore, the period of Murphy's segregation was a good deal shorter (approximately three months). We conclude that plaintiff's claim that his daily twenty-four hour confinement for an eighty-six day period prior to disciplinary proceedings violated procedural due process is without merit and should be dismissed.

■ Plaintiff also claims due process violations resulting from the defendants' refusal of his request to call witnesses and to cross-examine his accusers before the Disciplinary, Assignment, and Merit Committees. In Miller v. Twomey, *supra,* the court set out the minimum procedural requirements for due process in disciplinary proceedings. Inmates in such proceedings are entitled to advance written notice, a dignified hearing in which the accused may be heard, an opportunity to request that other witnesses be called or interviewed, and an impartial decision-maker. Not only does *Miller* not guarantee the right to call witnesses or to cross-examine accusers, it expressly reserves to the discretion of prison administrators the reasonable determination of which specific procedural advantages are to be accorded to inmates in particular disciplinary proceedings:

> We do not think it appropriate for us to try to define constitutional requirements with greater specificity at this time. Rather, we defer in the first instance to the greater expertise of the state officials to specify the appropriate time and form of written notice for various offenses; the extent to which evidence must be disclosed; the method for enabling a prisoner to explain or rebut the charges, including, if appropriate, an indication of the situations in which he may insist that witnesses be called or at least interviewed and the extent to which a written statement of the disposition of the charge should be made. Miller v. Twomey, *supra,* 479 F.2d at 716.

Just as the above language indicates the court's concern that it not dictate the details of notice, hearing, decision, etc., which are within the administrative province of prison officials, so its operative language (see p. 1255) equally affirms the essentiality to due process of notice, the appearance or interview of witnesses on behalf of an inmate in a disciplinary proceeding, etc. The view that *Miller* requires only that inmates be afforded an opportunity to *request* witnesses ignores the dual concern expressed by the court. The opportunity to request witnesses without the concomitant granting of such a request by members of the Disciplinary Committee in the absence of special considerations would be a hollow right and a result which *Miller* clearly did not contemplate.

■ The problem presented by the defendants' reading of *Miller* is particularly pronounced in the instant case where the plaintiff alleges that the guards accusing him of participation in

the riot of September 6 and of having a weapon were blindfolded. This allegation, if supported, calls into question the very evidence which forms the basis of the Disciplinary Committee's decision (Defendants' Memorandum In Support Of Motion To Dismiss Or For Summary Judgment, p. 10). On the other hand, plaintiff could be cleared of any participation in the September 6 riot, if he could show that he had no weapon and was not a part of the planning or implementation of the events of that day. The testimony of witnesses could be crucial in establishing the above facts; consequently, the opportunity to call them was essential to this inmate's defense against charges which could and did result in his removal from the general prison population.

As applied to the instant case, *Miller* fairly read, requires that, absent special circumstances, members of a prison disciplinary committee provide an inmate the opportunity to call witnesses where he shows the relevance of that witness's testimony to his case. An exception exists, of course, where this procedure would present a danger to the safety or objectives of the institution.

■■ We are reinforced in this view of what due process requires relative to the calling of witnesses by Adams v. Carlson, 375 F.Supp. 1228 (E.D.Ill. 1974), and Wolff v. McDonnell, *supra.* In Adams v. Carlson, *supra,* the court in applying *Miller* said the following:

> The inmate shall have the right to present live testimony of witnesses (both inmates and guards) relevant to his defense, subject only to the limitation that they be of a reasonable number, not to exceed four in the normal hearing. The inmate will also be allowed to present any relevant documentary or tangible evidence, affidavits, or statements which aid in his defense, and such evidence shall become part of the hearing record.

The court clearly indicated that the prison officials' discretion to interview, rather than call witnesses, should only be used in exceptional circumstances.

In addressing this question, the Supreme Court in Wolff v. McDonnell, *supra,* took the following position:

> We are also of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. Wolff v. McDonnell, *supra,* 418 U.S. at 566, 94 S.Ct. at 2979.

Hence, *Miller,* as well as more recent court decisions, indicates that inmates in disciplinary proceedings may not without justification be denied the opportunity to call witnesses on their own behalf. Accordingly, we will deny defendants' motion to dismiss plaintiff's due process claim based on the Disciplinary Committee's apparently arbitrary denial of his request to call witnesses.

■ The plaintiff also claims that his due process rights were violated when he was denied the opportunity to confront and cross-examine his accusers. *Miller* sets out the minima required by the due process clause for in-prison disciplinary proceedings. These do not include a right to confront and cross-examine witnesses. In fact, *Miller* expressly denies any absolute right to confront and cross-examine witnesses. The court clearly, therefore, reserves this question to the discretion of prison administrators. Again, the United Stated District Court in Adams v. Carlson, *supra,* in interpreting *Miller,* and the United States Supreme Court in Wolff v. McDonnell, *supra,* address the issue. The *Adams* court rejected the view that due process requires that inmates be allowed to confront and cross-examine witnesses at in-prison disciplinary proceedings. The underlying reasoning, which considered the possible effect on prison authority and safety, was that the supervisory, counseling relationship between staff witnesses and inmates would

be undermined by the practice, while inmate witnesses may incur a variety of retaliatory actions. The Supreme Court, more generally but quite affirmatively, recently indicated that, because of the hazards to institutional interests presented by this procedure, the Constitution should not be read at this time as requiring that inmates be afforded the opportunity to confront and cross-examine witnesses. Wolff v. McDonnell, *supra*.

While we are bound by these decisions, we are constrained to observe that the reasons given for denying the traditional right of an accused to confront and cross-examine his accusers are something less than overwhelmingly persuasive. It certainly is not beyond possibility that staff or inmate witnesses may be in error as to their recollection of past events whether inadvertently or deliberately. Since the possible punishment, as evidenced by the instant case, may be severe—isolation, segregation, delay or denial of parole or release—it is no less important to seek to ascertain the truth in disciplinary proceedings than it is in criminal trials.

No experienced penologist or inmate would seriously contend that the identity of a staff or inmate witness is likely to remain a secret from the accused for very long. The circumstances of any incident giving rise to disciplinary proceedings necessarily limits the potential witnesses to those present. In addition, prison "grapevines" are much too effective to achieve that degree of secrecy in most instances. Protection against possible retaliation requires more than non-confrontation while its denial may well result in injustice.

As indicated, however, we are obliged to follow the decisions referred to previously. Accordingly, summary judgment will be entered in favor of the defendants as to the plaintiff's allegation that he was denied due process when not given the opportunity to confront and cross-examine his accusers before the Disciplinary Committee.

■ Since an inmate's appearance before the Institutional Assignment Committee (IAC) and the Merit Staff serve only to inform him of actions taken in response to the Disciplinary Committee's findings, no purpose is served by calling witnesses before these two bodies. If confrontation and cross-examination are not required by due process in fact-finding disciplinary proceedings; a *fortiori*, this requirement does not extend to the IAC and Merit Staff proceedings. Therefore, plaintiff's claim that he was denied due process by not being allowed to call and cross-examine witnesses before the IAC and Merit Staff is also dismissed for failure to state a claim on which relief can be granted.

## II

The plaintiff alleges in his complaint that approximately fifty whites and 250 blacks were charged with the same rule infractions growing out of the activities of September 6, 1973, but that only one white prisoner was found guilty in the disciplinary proceedings while fifty blacks were found guilty and placed in segregation. Based on these alleged facts, the plaintiff claims that the selection of fifty blacks and one white was based on racial discrimination and as such was a violation of the "equal protection clause" of the Fourteenth Amendment.

Defendants move to dismiss this claim as failing to state a constitutional cause of action based on Thomas v. Pate, 493 F.2d 151 (7th Cir. 1974), and Briscoe v. Kusper, 435 F.2d 1046 (7th Cir. 1971). Alternatively, they move for summary judgment in that the plaintiff's confinement to segregation was based on the Disciplinary Committee's decision and, therefore, not arbitrarily founded upon racial considerations. We are unable to grant either motion.

■ On a motion to dismiss, the facts alleged in the plaintiff's complaint are to be taken as true. Such a motion is not to be granted unless it ap-

pears that the plaintiff can "prove no set of facts in support of his claim which would entitle him to relief." Haines v. Kerner, 404 U.S. 519, 521, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). The absence of precise allegations which establish a denial of equal protection does not defeat the prisoner's claim, particularly where a pro se complaint is filed. Haines v. Kerner, *supra*, at 520, 92 S.Ct. 594.

Defendants' reliance on Briscoe v. Kusper, *supra*, and Thomas v. Pate, *supra*, is misplaced. In *Briscoe*, the plaintiffs, twelve of forty-six candidates barred from the ballot in the 1967 Chicago aldermanic election, asserted that they were denied equal protection because their legally sufficient petitions were denied places on the ballot. They contended that the arbitrary misapplication of the state laws in itself constituted a violation of their rights to equal protection. The court disagreed with this contention holding that an equal protection violation requires state action which discriminates against a person or group based on an invidious (non-rational) classification. In the instant case, the plaintiff alleges discrimination between white and black inmates in prison disciplinary proceedings.

Thomas v. Pate, *supra*, is similarly distinguishable from this case in that there the defendants set forth reasons —educational level, experience in the prison, skills—why inmates were assigned certain jobs and, thereby, accounted for the disparity between whites and blacks in the more desirable jobs. In the present case, defendants set forth no reasons for the alleged disproportion between blacks and whites who were charged and punished and those who were out of their cells during the disturbance.

■■■■■■ It is impermissible for prison authorities to discriminate against inmates on account of their race. Tilden v. Pate, 390 F.2d 614 (7th Cir. 1968). The equal protection clause compares the treatment of one person to that of another person or class of persons. To es-

tablish the violation, a plaintiff must show the "alleged invidious discrimination against one person in favor of another person or class of persons with no rational basis for differentiation in treatment. Burns v. Swenson, *supra;* Rowland v. Wolff, 336 F.Supp. 257 (D. Neb.1971).

■■■ The plaintiff's complaint alleges that of the approximately 300 inmates improperly out of their cells on September 6, 1973, approximately fifty (16.6%) were white; of the fifty, one (2%) was confined to segregation. On the other hand, of approximately 250 (83.3%) blacks who were improperly out of their cells on the same day, approximately fifty (20%) were confined to segregation. Additionally, the plaintiff alleges that the prison guards who identified him as one of the prisoners responsible for the riot and as having a weapon were blindfolded at the time. These allegations certainly raise factual questions as to whether the disparity in the treatment of blacks and whites allegedly involved in the same activity was rationally based.

■■■ Federal courts will not look into the discipline and administration of state detention facilities unless deprivations of constitutional dimensions are involved. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Burns v. Swenson, *supra*. The plaintiff's claim of equal protection violations growing out of the disciplinary proceedings surrounding the September 6 riot at Joliet reaches that level of seriousness. We, therefore, deny defendants' motion to dismiss the plaintiff's claim for relief based on the violation of his right to equal protection.

Defendants in their memorandum in support of summary judgment offer the testimony of one prison guard who was held hostage during the riot as a factual basis for finding that the plaintiff had participated in the riot. Plaintiff, however, alleges in his complaint that the prison guards were blindfolded during the September 6 incident. The resolu-

tion of this factual issue may prove crucial in determining whether the Disciplinary Committee's results were arbitrarily reached. Also, the statistics offered by the defendants, which represent the number of prisoners in cellhouse-B on September 6, who were charged with violations and confined to segregation, do not indicate the number of whites improperly out of their cells but not charged. Therefore, the question of possible violations in the charging of inmates with infractions stemming from participation in the events of September 6 remains. Accordingly, the motion for summary judgment will be denied.

### III

The defendants have moved for summary judgment on the plaintiff's allegation that he was subjected to cruel and unusual punishment when denied outdoor exercises and given not more than three showers. The same motion was made with respect to the plaintiff's allegation that he suffered from constant headaches and drowsiness as a result of his confinement.

The defendants correctly point out in their memorandum that isolated or segregated confinement does not per se amount to cruel and unusual punishment. Adams v. Pate, 445 F.2d 105 (7th Cir. 1971). In *Adams* the following conditions were present: 1) the cell was in an "inhumane, filthy and foul" condition; 2) the cell was 8′ x 15′; 3) the cell lacked adequate ventilation; 4) the ceiling light was turned on only when the prisoner was fed; 5) the inmate had to drink water from a faucet 13 inches above the commode, which was engulfed in the commode's foul stench. The court held that these conditions while obviously unpleasant were not so foul, inhuman, and violative of basic concepts of decency as to fall within the proscriptions of the Eighth Amendment.

The courts have held in numerous instances, however, that certain conditions of confinement are so inhuman as to offend our basic concepts of decency.

Thomas v. Pate, *supra*. Such severe conditions have been consistently held violative of the Eighth Amendment prohibition. Haft & Hermann, Prisoner's Rights, n. 6 at 346–356 (Practicing Law Institute 1972). In Thomas v. Pate, *supra*, the court denied a motion to dismiss a claim that the plaintiff's conditions of confinement amounted to cruel and unusual punishment. There the following conditions were present: 1) overcrowding—ten to eleven prisoners in cells with dimensions of twenty-one feet by ten feet, 2) absence of hot water, 3) rough, cold and damp floors, 4) ice formations on the cells' inner walls during the winter, 5) insects and rodents in the cells, 6) inadequate clothing and filthy blankets, 7) lack of proper food and exercise. The court declined to indicate what specific conditions, if proved, would afford relief to Thomas. It merely held that it could not, based on plaintiff's allegations, hold that no set of facts entitling plaintiff to relief could be shown.

Courts will generally not find that conditions of confinement constitute cruel and unusual punishment unless one or more of the following conditions are present: prolonged nudity, Wright v. McMann, 387 F.2d 519 (2nd Cir. 1967); overcrowding, Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970); Jones v. Wittenberg, 323 F.Supp. 93 (N.D.Ohio 1971); unjustified physical beatings, Courtney v. Bishop, 409 F.2d 1185 (8th Cir. 1969); inadequate food or water, Dearman v. Woodson, 429 F.2d 1288 (10th Cir. 1970); absence of adequate ventilation or heat, Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal. 1966); absence of medical care, Gates v. Collier, 349 F.Supp. 881 (N.D.Miss. 1972); unsanitary living conditions, Sinclair v. Henderson, 435 F.2d 125 (5th Cir. 1970); excessive length of confinement in light of conditions, Jordan v. Fitzharris, *supra*. On the other hand, courts have refused to find that conditions of confinement constitute cruel and unusual punishment merely because they are characterized by temporary inconveniences and discomforts. Ford v.

Board of Managers of New Jersey, 407 F.2d 937 (3rd Cir. 1969). In *Ford, supra,* the inmate was assigned to solitary confinement for a five day period, fed a diet of four slices of bread plus one pint of water three times a day with one full meal every third day, and permitted no showers. The confinement cell contained no wash bowls or running water and possessed a pervasive stench. The inmate was unable to wash before eating and was made to sleep on an old mattress covered with a clean sheet. Generally, the courts have been unwilling to find that withdrawal of conveniences constitutes cruel and unusual punishment where the inmate in solitary confinement is provided with minimum decent living conditions. Haft & Hermann, Prisoner's Rights, *supra,* at 346–356.

█ In the instant case, the plaintiff alleges that he was confined to his cell from September 6 to December 2, the date he appeared before the Disciplinary Committee, and confined in segregation from December 3, 1973 to March 13, 1974 (the latter date is supplied by the defendants' memorandum p. 12). The plaintiff asserts that he was allowed three showers and no outdoor exercise during this five months period. Additionally, eight inmates, confined to segregation under the same circumstances and conditions as the plaintiff, assert by affidavit that prisoners in segregation were fed small portions of food through rusted steel bars, that the food was spoiled, rotted, and possessive of a foul smell when served, that the food was served from a wagon used to pick up garbage and covered with dirt, filth, and stinking odor, that the wagon had never been washed, that the food was delivered cold and without a cover, and that inmates were compelled to inhale the noxious smoke fumes created when certain neurotic inmates burned blankets and prison guards refused immediately to open windows to allow proper ventilation.

Unlike the specific allegations put forth in Adams v. Pate, *supra,* the facts alleged here indicate the existence of unsanitary conditions which transcend mere unpleasantness. In *Adams,* inmates complained that ventilation was merely inadequate; here, plaintiff alleges that those in segregation were forced to inhale smoke fumes, while ventilation was deliberately shut off. In *Adams,* the plaintiffs put forth conclusory allegations that cells were filthy, inhumane and foul. Here plaintiff alleges specifically that the food served was spoiled, rotted and foul, that the wagon used to serve the food was the one used to dispose of garbage, that such wagon was never cleaned, and that food was served cold and uncovered. Additionally, the plaintiff claims that he was deprived of daily exercise and regular showers. The concurrence of these facts distinguishes the instant conditions from those present in Adams v. Pate, *supra,* and approximates quite closely those of Sinclair v. Henderson, *supra.* In view of the standard enunciated by the Supreme Court in Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1957), "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society," and the holdings of recent cases concerning cruel and unusual punishment in conditions of incarceration, the conditions set out in plaintiff's complaint as well as those asserted in the affidavit, if proven, may constitute cruel and unusual punishment. Accordingly, the defendants' motions to dismiss and for summary judgment with respect to this claim are denied.*

█ To the extent that the plaintiff seeks to restore the statutory good time taken in violation of his due process and equal protection rights, such relief would be denied under the Supreme Court's holding in Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d

---

* It is noted that defendants challenge plaintiff's allegation that he was allowed only three showers. This denial simply raises an issue of material fact and thereby precludes any grant of summary judgment on the issue of cruel and unusual punishment.

439 (1973). The court has also held, however, that an action under section 42 U.S.C. § 1983 for the improper taking of statutory good time may appropriately be brought for damages and declaratory relief. Wolff v. McDonnell, *supra,* 418 U.S. at 553–555, 94 S.Ct. 2963. Thus, the plaintiff may maintain the present action for damages based upon the allegedly improper taking of statutory good time.

■ Also, *Preiser, supra,* does not prevent the enjoining of prison practices that ultimately lead to the improper taking of statutory good time. Wolff v. McDonnell, *supra,* at 555, 94 So.Ct. 2963. Any punishment or retaliation against an inmate for exercising his Fourteenth Amendment right to court access constitutes such a practice. Andrade v. Hauck, 452 F.2d 1071 (5th Cir. 1971); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The plaintiff sets out facts in his complaint which, if proven, could lead to injunctive relief against practices of the defendants which inhibit the inmate's access to the courts. Since the defendants do not address the retaliation issue in their motion to dismiss, the plaintiff's claim necessarily survives that motion.

## CONCLUSION

An order consistent with the foregoing will enter dismissing plaintiff's claims for relief based on: 1) his isolated confinement prior to the notice and holding of disciplinary proceedings, 2) his being denied the opportunity to cross-examine his accusers before the Disciplinary, Assignment, and Merit Committees, 3) his being denied the right to call witnesses before the Assignment and Merit Committees. An order will enter denying defendants' motions with respect to plaintiff's allegations based on: 1) his being refused the opportunity to call witnesses during the disciplinary proceedings, 2) his being confined to segregation in violation of his right to equal protection, 3) his

confinement under conditions constituting cruel and unusual punishment, and 4) retaliation by defendants against the plaintiff for his use of the courts to prosecute his grievances.