**Earl Ward CLEMENTS, Plaintiff,**

v.

**John W. TURNER, Warden, Utah State Prison, et al., Defendants.**

**No. C 104–72.**

United States District Court,
D. Utah, C. D.

June 27, 1973.

Michael D. Esplin, Salt Lake City, Utah, for plaintiff.

Joseph P. McCarthy, Asst. Atty. Gen., Salt Lake City, Utah, for defendants.

## OPINION AND ORDER

ALDON J. ANDERSON, District Judge.

### I FACTS

This is a civil rights action brought pursuant to sections 1343 and 1983 of the Civil Rights Acts. (28 U.S.C. § 1343; 42 U.S.C. § 1983.) Plaintiff is, and at all times material to the action was, confined at the Utah State Prison. His *pro se* complaint seeks damages and injunctive relief against the warden of the Utah State Prison and immediate release from custody. The latter claim for relief, which sounds in habeas corpus, was dismissed upon motion by the plaintiff. Subsequent to the filing of the complaint the court appointed counsel to represent the plaintiff.

Plaintiff's claims for damages and injunctive relief are based on two grounds. He alleges he was confined in a "strip cell" at the prison for a period of 14 days in violation of 1) his right not to be deprived of liberty without due process of law; and 2) his right to be free from cruel and unusual punishment. (U.S.Const. amends. XIV & VIII.) In the course of the trial evidence was presented by both sides on each of these two issues.

The evidence shows that on March 5, 1972, at approximately 10:25 p. m., one Lieutenant Lundell conducted a "shake down" of plaintiff's cell in the medium security section of the prison. It is an uncontroverted fact that on that occasion prison guards found contraband consisting of a needle, a syringe and what appeared to be five methadone tablets on plaintiff's person or in his cell. Lieutenant Lundell recorded the same in a disciplinary write-up, which was transmitted to the Prison Disciplinary Committee together with a disciplinary write-up from a Sergeant Olson, who attested therein to having seen plaintiff in the act of evacuating air from a syringe preparatory to administering an injec-

tion. It was Sergeant Olson who then touched off the shake-down of plaintiff's cell.

Immediately following the incident plaintiff was taken to cell C–1 of the prison's maximum security wing. Three days later, on March 8, 1972, he was brought before the Disciplinary Committee. The Committee consisted of a member of the warden's staff, who was chairman, the Social Service Supervisor at the prison, and a social worker. Although he had theretofore been given no formal notice of the substance of the disciplinary write-ups which were the cause of his appearance before the Committee, at the time of the incident Clements was told by Lieutenant Lundell that a disciplinary hearing would be held and at the outset of the hearing itself the full disciplinary report, presumably including the texts of the two disciplinary write-ups, was read aloud to Clements by the Committee chairman. The chairman then asked him for answer. According to the testimony of all three Committee members, Clements made no answer, explanation or statement of any kind, except to say, in effect, "No, do your thing." No witnesses were heard and no written findings were made. Although Clements did not ask to confront his accusers, present witnesses on his own behalf, or have the assistance of counsel, it appears that none of these accoutrements of due process would have been accorded him had he requested them. Furthermore, all Committee members testified that the truthfulness of the disciplinary report is assumed. When cross-examined by Clements' counsel, the chairman testified that with the written reports it wouldn't have made any difference had Clements claimed innocence at the hearing. The other Committee members testified with some equivocation that although it was the Committee's procedure to allow the prisoner to explain or tell his story, the function of the Committee was to determine the degree of punishment, not to determine guilt or innocence. It is this apparent absence of impartiality, together with the absence of 1) prior written notice of charges; 2) confrontation of accusers; 3) opportunity to present evidence; 4) counsel; and 5) written decision, which forms the basis of the plaintiff's claim of denial of Fourteenth Amendment due process.

The disciplinary hearing lasted 5–10 minutes. The Committee concluded Clements should be confined in maximum security for 29 days, the usual punishment for major infractions of prison rules such as the possession of contraband. On March 8 Clements was placed in cell A–6 in the isolation block within the maximum security wing. Cell A–6 was one of four so-called "strip cells" located in the isolation block at the time of the incident. The plaintiff was removed to the Weber County jail for a ten-day period beginning March 13 and ending March 22. On the latter date he was returned to A–6, where he remained until March 29, when he was transferred to A–3, which was an isolation cell, as opposed to a "strip cell." Finally, on April 5 the plaintiff was returned to medium security. The subject of plaintiff's cruel and unusual punishment claim is the total of 14 days spent in the "strip cell" before and after the trip to the Weber County jail.

The conditions existing in A–6 during plaintiff's occupancy were fully developed at the trial. The plaintiff even introduced into evidence a motion picture film taken within the isolation block depicting both isolation and "strip cells." (However, the film was made nearly a year after plaintiff's confinement and the "strip cells" had not been used since plaintiff left.) It appears that the "strip cell" in question measured approximately six feet wide, eight feet deep and ten feet high. The surfaces consisted of exposed concrete. Like all maximum security cells, A–6 had no windows. Light was provided by a single 100-watt bulb hanging from the ceiling which was dimmed from 10:00 p. m. to 6:00 a. m. There was no sink. Water for drinking and washing was furnished at mealtime (meals were served

three times a day) in a quart-size plastic container. Notwithstanding the repeated, emphatic statements of plaintiff and his witnesses to the contrary, the court also finds that prisoners in A Block were furnished additional water upon request and that Clements was not refused additional water by prison guards. Each of the guards who worked the various shifts in A Block during the period of plaintiff's confinement there testified that he had never refused a request for additional water from plaintiff, or anyone, and that prisoners in A Block had an opportunity to make such requests at least every two hours, when head counts were made.

Continuing the description of cell A–6, the evidence shows that there was no commode, rather only what is sometimes termed an "Oriental toilet"; that is, a hole in the concrete six inches in diameter with facility inside the cell for flushing. There was no bed frame, but only a foam rubber mattress with sheets and blankets. Clean sheets were provided weekly. Toilet articles were supplied according to need, including a toothbrush, toothpaste, a towel and soap. Once a week Clements was given one-half hour to shower and to sweep and mop his cell. Mop, bucket and cleanser were available. It was the prisoner's responsibility, however, to do such cleaning and Clements could easily have cleaned from his cell the minor accumulations of dirt and excrement which appear to have been present during his occupancy. The cells were cleaned by prison officers between occupancies. The film which was shown was irrelevant in this case to the extent it showed dirt and refuse which had accumulated in the strip cells during the nine months of disuse which preceded its production.

At the entrance to A–6 were two doors, one a barred door and the other a solid steel door. The barred door was always kept shut, but the solid door was left open. This allowed conversation among inmates in isolation and "strip cells," but prevented them from easily viewing one another. Ventilation in the isolation block was not as good as that in other parts of the building. Prior to the time in question the large ventilation ducts in the walls of the strip cells had been closed off as the result of escapes made through the vent ducts. The ducts were replaced by four 4-inch pipes which were cemented into place. Less air could be evacuated through the pipes, which resulted in an increase in temperature and stuffiness in the isolation block. Since there was no air conditioning at the prison, on occasion during the summer temperatures in the "strip cells" rose to the upper 80s, or 4–5° warmer than those in other areas of the prison. In the winter, since a single thermostat regulates the temperatures in A Block, B Block and C Block, the temperature is adjusted to the optimum level for B and C and the temperature in isolation, again, is similarly higher. Nevertheless, even with the decreased ventilation, a complete air change was effected every 12 minutes according to the testimony of Lieutenant Clayson.

Of course confinement in the isolation block meant removal from the general prison population and loss of recreation and hobby privileges. However, Clements was allowed to receive books from the library. Chewing tobacco was available upon request and although no mail could be received by him during the period of his confinement, he was free to write and mail letters and writing materials were available for his use. He was also free to correspond directly with defendant Turner concerning complaints related to his confinement in A Block. Plaintiff made no attempt, however, to communicate a complaint to the warden.

In keeping with prison policy plaintiff was transferred from A–6 to an isolation cell (A–3, with commode, sink and running water) within a reasonably short time after one of the isolation cells (which had been full at the time he was brought to maximum) became vacant. As a result of his confinement in the strip cell plaintiff claims to have contracted a cold and lost several pounds.

## II LEGAL BACKGROUND

We in this country have just emerged from an epic revolution in the law respecting the rights of the accused, particularly the right of the accused in a state court proceeding to enjoy the protections embodied in the Bill of Rights. Illustrative of this revolution is the expansion by the courts of the Sixth Amendment right to counsel in criminal proceedings. For the purpose of expanding that right the courts have enlarged the meaning of "criminal proceeding" to include not only the formal process of guilt determination, but also the events occurring during the initial period of incarceration prior to trial, the sentencing process, and the pursuit of appellate relief.[1] On the heels of Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed. 336 (1967), which held that appointed counsel is required in deferred sentencing situations, has come an expansion of the right to counsel beyond even the broad limits placed upon it in that case and an expanded application of the procedural due process safeguards of notice, hearing, confrontation and cross-examination in the context of post-conviction proceedings. In *Mempa*

the Supreme Court interpreted the Sixth Amendment to require counsel "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." 389 U.S. at 134, 88 S.Ct. at 257. In the recent case of Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) the Court held that even though the revocation of parole is not a part of the criminal prosecution, the loss of liberty entailed is a serious deprivation requiring that the parolee be accorded due process. Due process in such circumstances was held to entitle the parolee to two hearings, one at the time of arrest to determine whether there is probable cause to believe that a parole violation has been committed and the other a more comprehensive hearing prior to the final revocation decision, at which certain specified formalities must be observed.[2] Still more recently the Court has ruled that preliminary and final hearings must be conducted under the conditions specified in *Morrissey* in connection with the revocation of probation and, in addition, that indigent, probationers must be provided with counsel at state expense when fundamental fairness requires.[3]

---

1. *See, e. g.*, Mempa v. Rhay, 389 U.S. 128, 137, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) (appointed counsel required at deferred sentencing proceedings) ; Miranda v. Arizona, 384 U.S. 436, 470–471, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966) (appointed counsel required when suspect taken into custody) ; Douglas v. California, 372 U.S. 353, 357, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (appointed counsel required for the first appeal of right).

2. These formalities include

   (a) Written notice of the claimed violations of parole ; (b) disclosure to the parolee of evidence against him ; (c) opportunity to be heard in person and to present witnesses and documentary evidence ; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation) ; (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers ; and (f) a written statement by the factfinders as to the ev-

idence relied on and reasons for revoking parole.
408 U.S. at 489, 92 S.Ct. at 2604.

3. Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). In ascribing broad limits to the concept of fundamental fairness, termed by Mr. Justice Powell the "touchstone of due process," the Court's opinion stated :

   It is neither possible nor prudent to attempt to formulate a precise and detailed set of guidelines to be followed in determining when the providing of counsel is necessary to meet the applicable due process requirements. The facts and circumstances in preliminary and final hearings are susceptible of almost infinite variation, and a considerable discretion must be allowed the responsible agency in making the decision. Presumptively, it may be said that counsel should be provided in cases where, after being informed of his right to request counsel, the probationer or parolee makes such a request, based on a timely and colorable claim (i) that he has not committed the alleged vi-

Simultaneous with these developments has come a corresponding growth of the concept of due process of law within the context of civil administrative proceedings. In a series of such cases procedural restraints, principally the right to an evidentiary hearing, have been applied where important private interests have been at stake, usually at the hands of government.[4] In Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), perhaps the most far-reaching of these cases, the Court ruled that prior to threatened termination of federally-assisted welfare benefits the welfare recipient must be accorded a pretermination evidentiary hearing, adequate notice detailing the reasons for termination, an effective opportunity to defend by confronting adverse witnesses and by presenting oral evidence and argument in his own behalf, the right to retain counsel to represent him, the right to an impartial decisionmaker and a statement by the decisionmaker setting forth the reasons for his determination and indicating the evidence relied on.

■ The revolution which has taken place with respect to the rights of the accused has thus sent its reverberations throughout the spheres of sentencing, appeal, probation, parole, juvenile court proceedings and administrative law. Nowhere, perhaps, have the reverberations been felt as strongly, however, as in the area of prisoner suits under the Civil Rights Acts, where the effect has been greatly magnified by an accompanying nationwide movement for prison reform. The effect has been a proliferation of civil rights actions during the past twelve years seeking damages and injunctive relief against prison authorities for abusive disciplinary action taken against prisoners. These cases have seen the demise of the old "hands-off" doctrine, which had long inhibited judicial intervention in matters of prison administration and which had been sustained by a judicial refusal to review claims made under the Civil Rights Acts and arising out of state prison disciplinary proceedings.[5] The implications of

olation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate and that the reasons are complex or otherwise difficult to develop or present. 411 U.S. 790, 93 S.Ct. 1764.

4. For example, relevant constitutional restraints have been held to apply to the termination of welfare benefits, Goldberg v. Kelly, 397 U.S. 254, 261–263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

5. The development of the civil rights action as a vehicle for redress of prisoner grievances of constitutional proportions is recounted in Wright v. McMann, 387 F.2d 519, 522–523 (2d Cir. 1967) (reviewing cases), on remand, 321 F.Supp. 127 (N.D.N.Y. 1970). The following is a chronological sampling of other cases illustrating this development and the diversity of approaches and remedial measures invoked by different federal district courts. Sewell v. Pegelow, 291 F.2d 196 (4th Cir. 1961) (complaint alleging religious discrimination stated cause of action under § 1983); Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.1965); obstruction of prisoner's access to courts

unlawful; prisoners entitled to reasonable medical attention at all reasonable times); Jordan v. Fitzharris, 257 F.Supp. 674 (N. D.Cal.1966) (confinement in solid concrete strip cell measuring 6' by 8' 4" cruel and unusual punishment where cell caked with bodily wastes, devoid of furnishings, fitted with "Oriental" toilet which must be flushed from outside and was flushed only twice each day, lacking interior light source and kept dark, lacking ventilation, unheated and where plaintiff kept naked during portion of his confinement in strip cell, given only undersized canvas mat on which to sleep and furnished no means for maintaining cleanliness; holding prison authorities had abandoned elemental concepts of decency in allowing such conditions of shocking and debased nature to prevail); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968) (prison rules concerning reading matter curtailed black prisoners' First Amendment right, and amounted to deprivation of equal protection of the laws); Hancock v. Avery, 301 F. Supp. 786 (M.D.Tenn.1969) (solitary confinement which consists of "dry cell" having no interior light source, "Oriental" toilet without interior flushing mechanism, denial of soap, towel, toilet paper, denial of clothing, mattress and blankets is cruel and unusual punishment; plaintiff forced to live

this apparent shift in judicial attitude are evident in the following statement by the court in Wright v. McMann, 321 F.Supp. 127, at 132 (N.D.N.Y.1970):

> No longer can prisons and their inmates be considered a closed society with every internal disciplinary judgment to be blissfully regarded as immune from the limelight that all public agencies ordinarily are subject to. . . . The judicial complacency of the past in regard to these problems and cautions for courts to refrain whenever possible . . . have been discarded.

In spite of the erosion of the "hands-off" doctrine, however, there remains a natural and proper reluctance on the part of federal courts to intrude themselves into the complex and delicate problems involved in the administration of penal institutions.[6] As the court stated in Jones v. Wittenberg, 323 F. Supp. 93, at 98 (N.D.Ohio 1971), modi-

fied, 330 F.Supp. 707, aff'd sub nom. Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972):

> It is well settled that the administration of state detention facilities is a state function. Federal courts have a natural reluctance to interfere with such administration and will intercede only where paramount federal constitutional or statutory rights supervene.

Likewise, the court in Hancock v. Avery, 301 F.Supp. 786, at 791 (M.D.Tenn. 1969), stated:

> As to the traditional preference for leaving matters of internal prison management to state officials, an analysis of recent cases indicates that while federal courts are still sensitive to the problems created by interference of federal judiciary in matters involving the internal discipline of state prisons, they will not hesitate to intervene in appropriate cases. . . . While the rule remains that

under animal-like conditions) ; Nolan v. Scafati, 306 F.Supp. 1 (D.Mass.1969), vacated on other grounds, 430 F.2d 548 (1st Cir. 1970) (where prison disciplinary action may result in solitary confinement or postponement of release date, due process of law requires that the prisoner be advised of the charge of misconduct, informed of the nature of the evidence against him, afforded an opportunity to be heard in his own defense, and that the decision of the prison authority be based upon substantial evidence) ; Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972) (reversing district court's determination that plaintiff's punishment cruel and unusual; holding that due process requires no procedural safeguards beyond notice of the accusation, notice of the evidence against the prisoner and an opportunity to explain the actions giving rise to the accusations) ; Kritsky v. McGinnis, 313 F.Supp. 1247 (N. D.N.Y.1970) (summary hearing where plaintiff given no opportunity to speak violated fundamental fairness where result was loss of 18 months of "good" time ; hearing must be given at meaingful time, in meaningful manner, before impartial decisionmaker who states the reasons for his determination) ; Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971) (where prisoner is cited for a violation of prison regulations which may

result in increased time, fine or forfeiture of earnings, isolation confinement longer than 10 days, or referral of case to district attorney for prosecution, prisoner must be afforded prior written notice specifying the charge and the alleged facts upon which it is based, opportunity to confront and cross-examine adverse witnesses, opportunity to call defense witnesses, counsel or counsel substitute, a decision based on the evidence, decision by an impartial decisionmaker, notice that right to appeal exists) ; Landman v. Royster, 333 F.Supp. 621 (E. D.Va.1971) (listing several factors each of which rendered the solitary confinement in question cruel and unusual punishment ; requiring that before serious punishment may be imposed upon prisoner for disciplinary infractions, prisoner must be afforded written notice of charges, hearing before an impartial tribunal, opportunity to present testimony and other evidence in defense of charges, opportunity to cross-examine adverse witnesses, and right to retain counsel or appoint a lay advisor to assist in preparation of case.)

6. *See, e. g.*, United States ex rel. Knight v. Ragen, 337 F.2d 425 (7th Cir.), cert. denied, 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed. 2d 277 (1964) ; Childs v. Pegelow, 321 F.2d 487 (4th Cir. 1963) ; Hatfield v. Bailleaux, 290 F.2d 632 (9th Cir. 1961).

matters of state prison discipline are not ordinarily subject to examination in federal court, the rule is otherwise if the treatment of prisoners is of such a nature that their constitutional rights are violated.

■■ To summarize the development of the test for federal judicial involvement in prison matters, it appears that whereas in the past federal courts refrained from interfering in the management of prison affairs whenever possible, today they will not hesitate to intercede when a prisoner's federal constitutional or statutory rights are at stake.[7] It is impossible under the present state of the case law, however, to describe the rule with any greater precision. It thus becomes the duty of the court in this case to determine whether conduct of the defendant and his fellow state employees has placed in jeopardy rights or, as they have also been termed (in order to avoid the vagaries of the recently interred "right-privilege" doctrine), substantial interests which are afforded protection by the United States Constitution and federal statutes.

## III CRUEL AND UNUSUAL PUNISHMENT

■ The principal legal test for determining whether punishment is cruel and unusual has come to be one related to current community standards of decency. This test asks whether under all the circumstances the punishment in question is ". . . of such character or consequences as to shock general conscience or to be intolerable in fundamental fairness." Lee v. Tahash, 352 F.2d 970, 972 (8th Cir. 1965) (see also Church v. Hegstrom, 416 F.2d 449, 451 [2d Cir. 1969]). Underlying the Eighth Amendment prohibition against cruel and unusual punishment is the basic concept of "the dignity of man." Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). The Court added in Trop at 101, 78 S.Ct. at 598:

The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

■ To the above test have been added two further tests set forth by the court in Jordan v. Fitzharris, 257 F. Supp. 674, at 679 (N.D.Cal.1966).

[A] punishment may be cruel and unusual if greatly disproportionate to the offense for which it is imposed. Weems v. United States, [217 U.S. 349, 368, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910)]; Robinson v. State of California, [370 U.S. 660] at 676, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (concurring opinion of Douglas, J.); Rudolph v. Alabama, [375 U.S. 889, 890, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963)] (dissenting opinion of Goldberg, J.). Finally, a punishment may be cruel and unusual when, although applied in pursuit of a legitimate penal aim, it goes beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used. Weems v. United States, supra, 217 U.S. at 370, 30 S.Ct. 544; Robin-

---

7. Among the rights retained by prisoners are those enumerated in the following quotation from the opinion of the court in Talley v. Stephens, 247 F.Supp. 683 at 686 (E.D.Ark.1965):

Although persons convicted of crimes lose many of the rights and privileges of law abiding citizens, it is established by now that they do not lose all of their civil rights, and that the Due Process and Equal Protection Clauses of the Fourteenth Amendment follow them into the prison and protect them there from unconstitutional administrative action on the part of prison authorities carried out under color of State law, custom, or usage. More specifically, prison authorities are not permitted to inflict upon convicts cruel and unusual punishments for violations of prison rules; they may not discriminate invidiously against a prisoner or class of prisoners; and they may not deny to a prisoner reasonable access to the courts to test the validity of his confinement or to secure judicial protection of his constitutional rights. (Citing cases.)

son v. California, supra, 370 U.S. at 677, 82 S.Ct. 1417 (concurring opinion of Douglas, J.); Rudolph v. Alabama, supra, [375 U.S.] at 891, 84 S.Ct. at 155 (dissenting opinion of Goldberg, J.).

Under none of the above tests is the punishment of which Clements complains cruel and unusual. The frank impression which the facts of this case leave upon the court is not one which shocks the conscience or offends against the dignity of man as defined by presently-evolved societal standards of decency. The punishment meted out by the Disciplinary Committee in this case cannot be compared with the punishment involved in any of the civil rights cases which have come to the court's attention in which injunctive or monetary relief has been awarded. The 14-day length of Clements' confinement is insignificant in comparison with the twelve months and eight days spent in solitary by the plaintiff in Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), under conditions comparable to those in the instant matter. Yet, in Sostre v. McGinnis the Court of Appeals for the Second Circuit held as follows at 191:

> Although the conditions Sostre endured were severe, we cannot agree with the district court that they were "so foul, so inhuman, and so violative of basic concepts of decency," Wright v. McMann, 387 F.2d 519 (2d Cir. 1967), as to require that similar punishments be limited in the future to any particular length of time. Nor can we agree that Sostre's own long confinement—however contrary such prolonged segregation may be to the views of some experts—would have been "cruel and unusual" had Sostre in fact been confined for the reasons asserted by Warden Follette, rather than on account of his beliefs and litigiousness.

Clements has not been subjected to corporal punishment or denial of medical attention as was the plaintiff in Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.

1965). His "strip cell" was not entirely devoid of furnishings, without light and ventilation, and caked with excrement as in Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966). Clements' cell was equipped with a toilet which could be flushed by him from within his cell, unlike the cell in Holt v. Sarver, 300 F. Supp. 825 (E.D.Ark.1969). He was not denied clothing, bedding, soap, towel and toilet paper as was the plaintiff in Hancock v. Avery, 301 F.Supp. 786 (M.D. Tenn.1969).

Furthermore, plaintiff has not suffered cruel and unusual punishment under either of the other postulated tests. His 14-day confinement in A–6 was not excessive punishment for possession of paraphernalia, a serious offense. Nor did the punishment go beyond what was necessary to achieve a legitimate penal aim. Prison authorities charged with the responsibility of maintaining order and promoting an atmosphere conducive to the correction of criminal behavior must exercise the strictest control over drug traffic at the prison. It is well within their proper discretion to conclude that punishment of the nature and duration involved in Clements' claims appropriately advances those aims. It is clear from the facts of this case that Clements' interest in being free from cruel and unusual punishment has in no wise been injured. By his own admission the only serious impact of his segregated confinement was the lack of ventilation. The court has found, however, that there was some ventilation, although perhaps deficient given the slightly increased temperatures present in the isolation block. The court has also found plaintiff's cell was lighted during the day, that the means were available to him with which to keep it clean; that plaintiff was given water, fed meals three times daily, clothed, and afforded mattress and bedding, toilet articles and reading materials; and that plaintiff's 14-day confinement was actually served in two parts, with a trip to the Weber County jail in between. The court concludes that during his stay in isolation

Clements suffered from nothing more than legally acceptable inconveniences associated with segregated confinement. Such confinement does not itself violate the Constitution.[8]

## IV DUE PROCESS OF LAW

In analyzing the interests of Clements at stake in the present dispute and determining the extent of procedural due process necessary for fairness, the court takes a cue from the concurring opinion of Mr. Justice Frankfurter in Anti-Fascist Committee v. McGrath, 341 U.S. 123, at 163, 71 S.Ct. 624 at 644, 95 L.Ed. 817 (1951), where he stated what he thought were the important considerations in making such a determination.

The precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed, the protection implicit in the office of the functionary whose conduct is challenged, the balance of hurt complained of and good accomplished —these are some of the considerations that must enter into the judicial judgment.

This balancing analysis was also pursued in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), where, for present purposes, it was articulated more succinctly. The determination of the extent to which procedural due process must be afforded a welfare recipient, the Court said, ". . . depends upon whether the recipient's interest in avoiding . . . loss outweighs the governmental interest in summary adjudication." 397 U.S. at 263, 90 S.Ct. at 1018. On the one hand it is clear that prison authorities must be given wide latitude and discretion in

the management and operation of their institutions. The courts cannot undertake to administer discipline for the violation of prison rules. Disciplinary policy and philosophy are inextricably entwined in the larger matter of the philosophy of detention and, under the usual circumstances, are beyond the ken of the courts and properly within the sphere of penological science.

On the other hand, Clements has claimed an infringement of his personal interests. With the elimination of cruel and unusual punishment as a claim, however, the sole remaining interest is the interest in being free from the arbitrary imposition of lawful segregated confinement as punishment for the violation of prison rules.

In balancing these interests it appears initially that the courts are in general agreement that the imposition of the full panoply of procedural restraints in the prison context would constitute an unwarranted and perhaps destructive incursion into the province of penologists. This court is not equipped to determine whether formal due process requirements would be likely to help or hinder in the state's endeavor to preserve order and discipline in its prison and to return a rehabilitated individual to society. Hence, although the cause of prisoner rights has been greatly advanced in recent years through penetrating scrutiny of institutional practices by the courts and other interested parties, the courts have been nearly uniform in their rejection of strict procedural formality in the conduct of prison disciplinary proceedings.[9] In the present dispute such a position is especially proper. With the elimination of plaintiff's Eighth Amendment claim there exists no collateral, federal constitutional or statu-

8. See Sostre v. McGinnis, 442 F.2d 178, 192 (2nd Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972) (citing cases).

9. This court is aware of only two presently-standing decisions wherein courts have mandated extensive due process require-

ments on their own initiative. See Clutchette v. Procunier, 328 F.Supp. 767 (N.D. Cal.1971); Landman v. Royster, 333 F. Supp. 621 (E.D.Va.1971). In each of the cases, however, the abuses complained of clearly exceeded in gravity the alleged abuses which are the subject of the instant suit.

tory right or interest at stake in these proceedings. He makes no claim of discrimination, denial of access to the courts, denial of medical attention, loss of good behavior time, or denial of First Amendment rights. Although Clements' remaining interest in being free from the inconvenience of segregated confinement may not be infringed by arbitrary acts, that interest is not as significant as it would be if the confinement in question had been so severe as to violate collateral constitutional rights. The question to be answered by the court under these circumstances, therefore, is what restraints are dictated by minimal due process.

In answering that question assistance is found in the following words of Mr. Justice Cardozo, writing the Court's opinion in Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 820, 79 L.Ed. 1566 (1935) adopting a flexible approach in defining the limits of due process restraints to be applied at that time in the context of probation revocation proceedings:

> Clearly the end and aim of an appearance before the court must be to enable an accused probationer to explain away the accusation. . . . This does not mean that he may insist upon a trial in any strict or formal sense. . . . It does mean that there shall be an inquiry so fitted in its range to the needs of the occasion as to justify the conclusion that discretion has not been abused by the failure of the inquisitor to carry the probe deeper.

This was the approach followed by the Court of Appeals for the Second Circuit in Sostre v. McGinnis, *supra*. There, in a case involving confinement under conditions similar to those in this case, but for a longer duration, the court stated the following, 442 F.2d at 199:

> If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning.

In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, see Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S. Ct. 652, 94 L.Ed. 865 (1950), and afforded a reasonable opportunity to explain his actions. (Citing cases).

Without holding that the deprivations here involved were substantial, this court holds that at his hearing before the Disciplinary Committee Clements was entitled to be confronted with the accusation (which does not require the personal appearance of accusing witnesses), informed of the evidence against him and afforded an opportunity to explain. The court further concludes that the Disciplinary Committee fulfilled these requirements.

The above-mentioned procedural safeguards, which tend to assure a hearing which is reasonably fair under the circumstances, presuppose that the hearing be conducted before an impartial tribunal both empowered and prepared to review with care the charge, the evidence supporting the charge and the explanation of the accused inmate, if any, and on the basis of such a review either dismiss the charge or pronounce appropriate punishment.

The question whether the Disciplinary Committee was impartial is the most troublesome problem in this case. If the Committee was not impartial, its adherence to the procedural restraints mentioned above was without meaning. The testimony of the Committee members evidences some confusion in their thinking concerning the ambit of their role in conducting disciplinary proceedings. Each testified that it was not the function of the Committee to determine guilt or innocence, but only to determine what action should be taken in view of the written disciplinary report, which was presumed true. Two

members of the Committee, Mrs. Peck and Mr. Franchina, testified that although the report was presumed true, there was room for an explanation by the inmate and that often charges were dismissed. This appears to have been their attitude at Clements' hearing. The Chairman, Lieutenant Reynolds, testified, however, that because of the disciplinary report in question, any claim of innocence which Clements might have made (he in fact said nothing) would not have made any difference in the outcome of the hearing. This, he said, was due to the fact that the Committee had no choice under the circumstances but to accept the disciplinary report as true. Nevertheless, it is the court's conclusion that when placed in the context of all the testimony offered on direct and cross-examination by the three Committee members, this statement by Reynolds does not serve to compromise the impartiality of the Committee. This is especially true where Clements offered no explanation when asked for one. Nor was it error for the Committee to proceed with the sole purpose of determining what action, if any, should be taken against Clements, rather than deciding guilt or innocence as well. A determination to punish or dismiss disciplinary charges against a prison inmate is not a process of guilt determination in the usual sense. It is properly a determination involving important considerations peculiar to the institutional setting, some of which may not be related to guilt or innocence. Latitude must be afforded prison authorities in making the decision whether to punish. A trial-type proceeding will not, therefore, be required. Nevertheless, punishment of the nature administered in this instance may not be administered arbitrarily. The determination of the Committee must be "premised on facts rationally determined." Sostre v. McGinnis, *supra*, at 199. Without intending to reflect upon the fairness with which past disciplinary hearings may have been conducted, in order to ensure the level of fairness which must obtain in such proceed-ings it is the judgment of the court that in any future proceeding against Clements for conduct as serious as that charged against him in this matter, which may result in punishment as substantial as the punishment administered in this matter, Clements shall be given advance written notice of the charge against him and of the date and time of the hearing. The hearing shall be conducted as soon as reasonably possible after the occurrence of the alleged infraction. The court strongly emphasizes that at such a hearing Clements shall be 1) again fully advised of the charge against him, including the evidence which supports the charge; 2) given full opportunity to respond to the charge and make an explanation or statement in his defense; and 3) afforded an impartial tribunal prepared and empowered to dismiss the charge or administer appropriate punishment based on facts rationally determined.

The court believes that the procedural restraints which have been discussed are required in order that the inquiry may be "so fitted in its range to the needs of the occasion as to justify the conclusion that discretion has not been abused by the failure of the inquisitor to carry the probe deeper." Escoe v. Zerbst, *supra* 295 U.S. at 493, 55 S.Ct. at 820.

It is the court's understanding that under the circumstances of this case the controlling case law does not require further procedural restraints, such as confrontation, cross-examination, opportunity to present defense witnesses, counsel or counsel substitute and a written record, at prison disciplinary hearings.

The court hereby orders the defendant to observe, and secure the compliance of those persons under his direction with, the procedures specified above with respect to any future charges which may be made against Clements and which may result in punishment of the nature and duration involved in this case. Plaintiff's other claims for monetary and injunctive relief are dismissed.