Virginia LAVINE et al., Plaintiffs,

v.

Ernest D. WRIGHT, Individually and in his capacity as Director of the Division of Corrections of the State of Utah, et al., Defendants.

No. C 75–221.

United States District Court,
D. Utah, C. D.

Sept. 29, 1976.

James T. Massey, Kathryn Collard, Salt Lake City, Utah, for plaintiffs.

Vernon B. Romney, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, Utah, for defendants.

## ORDER AND FINAL JUDGMENT GRANTING IN PART AND DENYING INJUNCTIVE AND DECLARATORY RELIEF.

ALDON J. ANDERSON, District Judge.

Plaintiffs, individually and as a class, seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 (1970) that the inmate classification procedures formulated and implemented by the Utah State Prison administration deprive plaintiffs of liberty without due process of law, that the plaintiffs' confinement in isolation and maximum security facilities after reclassification constituted cruel and unusual punishment, that requiring prisoners to submit to a polygraph examination as a condition for a reclassification determination deprives prisoners of their constitutional privilege against self-incrimination, and that the prison administration's use of chronological notes ("c-notes") on the prisoners' behavior deprives the inmates of due process of law and of equal protection. Plaintiffs seek to enjoin the prison administration's continued reliance on what they contend are unconstitutional classification procedures and to re-

quire the prison administration to implement immediately classification procedures which pass constitutional muster.[1] The court has been thoroughly advised by both parties at trial and in supplemental trial briefs of the facts and the law involved in resolving the present controversy and is prepared to enter judgment.

Pursuant to Utah Code Ann. § 64–9–25 (1968),[2] the Board of Corrections formulated and adopted specific procedures for classifying inmates within the minimum, medium, and maximum security facilities of the state prison. Although the Board of Corrections retained broad discretion to formulate the substantive standards and guidelines to be implemented for such classification proceedings, the Board established specific procedures to inform the inmates of how classification decisions would be made. The classification procedures entitle an inmate to advance oral notification of the time and purpose of a classification hearing with his Treatment Team. At the classification hearing, the inmate is entitled to be present, is confronted with the reasons for and evidence supporting the proposed change, which he may challenge, and receives verbal notification of the Treatment Team's decision. Following the hearing, the inmate is entitled to oral notification of the Treatment Team's decision including the reasons therefor.

The Treatment Team's decision is then referred to the Executive Classification Committee ("ECC") which meets regularly to finalize the Treatment Team's recommended classification changes. The inmate is not entitled to be present at the ECC hearing. The ECC may modify the Treatment Team's classification recommendation, but the inmate is notified in writing of such a modification and the reasons therefor. The inmate may appeal from the ECC's classification decision to the Treatment Team only when the ECC's classification differs from the recommended classification.

To deal with emergency situations, and for the safety of the inmates and the institution, an additional classification procedure, known as "Administrative Segregation," is available to prison administrators. Administrative segregation entitles the inmate to the same procedural protections as provided in the Treatment Team classification hearing, but in light of the exigent circumstances giving rise to administrative segregation, these procedures are implemented *after* the segregation. The senior officer of the particular prison facility must approve the administrative segregation. Continued segregation beyond twelve hours requires the senior officer's or the warden's final approval. The inmate segregated by administrative action is entitled to a hearing before the disciplinary committee or the Treatment Team within fifteen days if he has been segregated in isolation, or within thirty days if he has been segregated in maximum security.

Although the plaintiffs do not challenge the constitutional sufficiency of the disciplinary procedures, they urge that the classification and disciplinary procedures should be substantively similar. The disciplinary procedures differ significantly for major and minor violations. The major violations are enumerated[3] and the minor violations are

---

1. Plaintiffs do not challenge the constitutionality of the disciplinary procedures that the prison administration has adopted, but seek to impose substantively similar procedural guarantees on prisoner classification proceedings.

2. The board shall also make and adopt rules for the separation and classification of prisoners, for their promotion and reduction from one grade to another, and from time to time change and amend the same as circumstances may require. In making such rules and regulations the board shall, as far as practicable and consistent with the discipline of the prison, adopt such as shall in its judgment best conduce to the reformation of the convicts.

3. "Major" violations include any act cognizable as a "crime" under the laws of Utah, any acts of "violence," destruction of state property or the property of another person, any involvement in setting fires, or attempts to escape. While Lavine was reclassified after a classification proceeding with her Treatment Team, the other three plaintiffs were reclassified through the disciplinary procedures for their participation in major violations.

defined as all non-enumerated violations. To conform to the due process requirements for prison disciplinary proceedings set forth in *Wolff v. McDonnell*, 418 U.S. 539, 563–72, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the state prison administration provides that inmates in major disciplinary hearings are entitled to a disciplinary hearing at which they may be present, advance written notice of that hearing, a right to counsel, a limited right to call witnesses and present evidence, a limited right of cross-examination, and written notification of the decision and the reasons therefor. The major disciplinary committee has a broad range of sanctions to impose for major violations. The procedural protections for minor violations are more limited and the range of sanctions available is narrower than in major disciplinary action. A minor violation is not sufficient grounds, standing alone, to justify a transfer to isolation or between security facilities.

### Due Process Claim

■ A comparison of the classification and disciplinary procedures reveals that a transfer between the minimum, medium, maximum, and isolation facilities is allowed under the prison rules and regulations for either classification or disciplinary proceedings and that an inmate's behavior may be the foundation for such transfer in either case. Since an inmate's behavior may be grounds for reclassification in either disciplinary or classification proceedings, and since the prison administration may circumvent the procedural rigors of disciplinary proceedings by merely conducting the more procedurally limited classification proceedings, the plaintiffs argue that both types of proceedings should equally protect those liberty interests of the inmate which a transfer between varying security facilities may affect. In light of *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), plaintiffs' argument is untenable.

The *Montanye* and *Meachum* decisions held that the due process clause does not require a hearing prior to a prisoner's transfer by prison authorities absent some foundation in state law establishing such a right. The Court in *Montanye* set forth the narrow limits of the *Meachum* holding:

We held in *Meachum v. Fano,* that no Due Process Clause liberty interest of a duly convicted prison inmate is infringed when he is transferred from one prison to another within the State, whether with or without a hearing, absent some right or justifiable expectation rooted in state law that he will not be transferred except for misbehavior or upon the occurrence of other specified events.

at 242, 96 S.Ct. at 2547. The court rejects defendants' contention that *Montanye* and *Meachum* directly support unlimited discretion in state prison officials to classify inmates. Although the state prison administrators have been statutorily authorized, and have undertaken to promulgate rules and regulations which create state protected prisoners' rights, thereby fostering the prisoners' justifiable expectations in a specific classification procedure, the inmates cannot be deprived of these state created rights arbitrarily and capriciously.

While the court recognizes that the prison administration's promulgation of rules and regulations pursuant to statutory authority has created "some right or justifiable expectation rooted in state law," the court rejects the plaintiffs' contention that the Utah statute implicitly requires the full panoply of procedural due process guarantees and substantive guidelines for classification proceedings that have been adopted for disciplinary proceedings. The state has authorized, and the state prison administration has formulated and adopted, rules and regulations that retain a significant residuum of administrative discretion in state prison officials to classify inmates within the state prison system. The due process clause does not require greater procedural guarantees and substantive guidelines in classification proceedings, absent a more extensive state created liberty interest in a prison inmate to remain in a particular security facility,

which would require a pretransfer hearing before deprivation thereof.

Insofar as the state has created a liberty interest in procedural due process protections prior to transfer between various security facilities,[4] the state cannot arbitrarily deprive an inmate of those state created rights unless due process notice and hearing are provided. The court has decided that the Treatment Team, Executive Classification Committee, and Administrative Segregation procedures described hereinabove represent state created rights which give prisoners a justifiable expectation that specific procedures will be followed in classification decisions. The court, therefore, agrees with plaintiffs' contention that this case falls within *Wolff v. McDonnell, supra,* but disagrees that *Wolff* mandates that the disciplinary and classification procedures be substantively similar.

*Wolff* held that certain procedural due process protections, particularly written advance notice and a written decision explaining the evidence and the reasons for the disciplinary action, are constitutionally required in a state prison disciplinary proceeding. The Court reached this decision based on *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), in which the Court had held that certain procedural due process protections were constitutionally required in parole and probation revocation proceedings. The Court's method of analysis in *Wolff* is critical in determining the procedural guarantees that should be afforded in the present case. The Court in *Wolff* did not strictly transplant all of the procedural protections from the parole and probation revocation proceedings into the prison disciplinary proceedings but engaged in a careful balancing of the individual and institutional interests to determine which procedural protections must be constitutionally imposed on prison disciplinary proceedings:

The deprivation of good time is unquestionably a matter of considerable importance. The State reserves it as a sanction for serious misconduct, and we should not unrealistically discount its significance. But it is qualitatively and quantitatively different from the revocation of parole or probation.

In striking the balance that the Due Process Clause demands, however, we think the major consideration militating against adopting the full range of procedures suggested by *Morrissey* for alleged parole violators is the very different stake the State has in the structure and content of the prison disciplinary hearing. That the revocation of parole be justified and based on an accurate assessment of the facts is a critical matter to the State as well as the parolee; but the procedures by which it is determined whether the conditions of parole have been breached do not themselves threaten other important state interests, parole officers, the police, or witnesses—at least no more so than in the case of the ordinary criminal trial. Prison disciplinary proceedings, on the other hand, take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. Some are first offenders, but many are recidivists who have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. Although there are very many varieties of prisons with different degrees of security, we must realize that in many of them the inmates are closely supervised and their

---

4. As the United States Supreme Court pointed out in *Meachum:*

The individual States, of course, are free to follow another course, whether by statute, by rule or regulation or by interpretation of their own constitutions. They may thus decide that

prudent prison administration requires pretransfer hearings. Our holding is that the Due Process Clause does not impose a nationwide rule mandating transfer hearings.

at 229, 96 S.Ct. at 2540.

activities controlled around the clock. Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner.

It is against this background that disciplinary proceedings must be structured by prison authorities; and it is against this background that we must make our constitutional judgments, realizing that we are dealing with the maximum security institution as well as those where security considerations are not paramount. The reality is that disciplinary hearings and the imposition of disagreeable sanctions necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escala-

tion of personal antagonisms on the important aims of the correctional process. 418 U.S. at 561–62, 94 S.Ct. at 2977–2978.

■ Similarly, in the present case the court must evaluate the competing institutional and individual interests, with due regard to the broad discretion that is necessarily reposed in prison administrators[5] and to the "nature" of the liberty interest at issue,[6] in order to determine which procedural protections are imported into the state prison classification proceedings. The court rejects any wholesale transplantation of procedures that are required for parole revocation or prison disciplinary proceedings into the classification context.

As institutional considerations, the Court in *Wolff* cited the potential of violence manifested in either the destruction of property or threats and reprisals against guards or fellow inmates, the unavoidable tension and frustration which necessarily exist in prison life but which should be minimized through orderly and reasonably safe prison procedures, and the need to discipline, through flexible procedures, those who violate prison rules and regulations. As individual interests, the Court cited the need to allow the disciplinary-ac-

5. To construe the classification procedures in the Utah state penal system as requiring substantively similar due process protections as are afforded in disciplinary procedures would improperly subject to federal judicial review and rigid standards an area of state prison organization that would thrust the federal court into every transfer decision thereby strictly limiting the necessary discretionary decisions of prison administrators. The Court in *Meachum* recognized the broad discretion that must be reposed in prison administrators and warned against federal courts unnecessarily intervening into the discretionary area:

Transfers between institutions, for example, are made for a variety of reasons and often involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate. Yet under the approach urged here, any transfer, for whatever reason, would require a hearing as long as it could be said that the transfer would place the prisoner in substantially more burdensome conditions than he had been experiencing. We are unwilling to go so far.

at 225, 96 S.Ct. at 2538.

6. The court hereby recognizes that the nature of a disciplinary proceeding fundamentally differs from a classification proceeding in that the former seeks to determine guilt or innocence in an adversary context and consequently involves significantly different institutional and individual interests that need procedural due process protections. A classification proceeding, on the other hand, is designed to accommodate institutional and individual interests for the primary purpose of achieving rehabilitative goals, the housing, privileges, and programs that affect the inmate must necessarily be determined within the sound discretion of the state prison administration so long as such discretion is exercised in good faith. *See LaBatt v. Twomey*, 513 F.2d 641, 647 (7th Cir. 1975). The record in the present case does not indicate any lack of good faith prison administration. The evidence does not show that prison officials intentionally circumvented and frustrated the disciplinary process by pursuing reclassification procedures rather than more procedurally appropriate disciplinary procedures.

tion defendant sufficient time to prepare a response to the charges, to be informed of the charges against him, to be afforded sufficient written reasons for the decision to pursue a meaningful review, and to be afforded an opportunity to avoid loss of the state created liberty interest, whatever that might be, which he retains while in prison. *Wolff* demonstrates that the Court does not mandate the imposition on state prison administrators of the full panoply of procedural protections afforded a criminal defendant. In addition, the Court was opposed in *Montanye* and *Meachum* to federal courts intruding into the day-to-day functioning of state penal institutions.[7]

In light of the foregoing considerations, this court concludes that the Treatment Team, Executive Classification Committee, and Administrative Segregation classification proceedings do not unconstitutionally deprive the plaintiffs of a state created liberty interest without pretransfer hearings. The state prison's rules and regulations, on their face, provide a flexible procedure for administering the affairs of the state prison and balance the institutional interests in classifying inmates according to varying security levels while allowing the inmates a sufficient, if necessarily limited, opportunity to be informed orally[8] of the classification hearing and of the proposed changes in custody status, to present their evidence against such a reclassification, and to be orally advised of the classification decision.

State law has not created a justifiable expectation that serious misconduct is the only basis of reclassification, but the state prison administration has retained broad discretion in transferring prisoners between different security facilities. This court finds the due process analysis in *Meachum* persuasive in analyzing the scope of state created rights and pretransfer due process protections:

> That an inmate's conduct, in general or in specific instances, may often be a major factor in the decision of prison officials to transfer him is to be expected unless it be assumed that transfers are mindless events. A prisoner's past and anticipated future behavior will very likely be taken into account in selecting a prison in which he will be initially incarcerated or to which he will be transferred to best serve the State's penological goals.
>
> A prisoner's behavior may precipitate a transfer; and absent such behavior, perhaps transfer would not take place at all. But, as we have said, Massachusetts prison officials have the discretion to transfer prisoners for any number of reasons. Their discretion is not limited to instances of serious misconduct. As we understand it no legal interest or right of these respondents under Massachusetts law would have been violated by their transfer whether or not their misconduct had been proved in accordance with procedures that might be required by the Due Process Clause in other circumstances. Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger

---

7. As the Court stated in *Meachum*:

> Holding that arrangements like this are within reach of the procedural protections of the Due Process Clause would place the Clause astride the day-to-day functioning of state prisons and involve the judiciary in issues and discretionary decisions that are not the business of federal judges. We decline to so interpret and apply the Due Process Clause. The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States.

at 228, 96 S.Ct. at 2540. The Court's reasoning applies with equal force in the case before this court where the state has not created as extensive pretransfer due process rights as the

plaintiffs may desire. The role of the federal court is not, however, to devise additional prison procedures and impose them upon the state. As the Court pointed out in *Meachum*, the plaintiffs may have to await further state creation of such liberty interests as would require pretransfer hearings.

8. While *Wolff* required *written* advance notice of a disciplinary proceeding, the court finds that oral advance notification of the classification proceeding is sufficient notice to comport with due process in the light of the fundamentally different nature and purpose of disciplinary and classification proceedings. *See* note 6, *supra*.

procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all.

at 228, 96 S.Ct. at 2540. The Utah state law has not deprived the state prison administration of broad discretion to classify and transfer inmates into different security classifications with the varying ranges of privileges attendant thereto.

■ Having concluded that the state classification procedures are not violative of due process on their face, the court must analyze plaintiffs' contention that the rules and regulations, as applied, deprived the plaintiffs of their state created liberty interest to remain in a particular security facility without due process of law. A thorough scrutiny of the facts in the case of each of the four named plaintiffs is essential to determine the individualized application of the state prison's rules and regulations governing classification of inmates.

The plaintiff Lavine was on medium security status on October 10, 1974, when she was placed on "permanent cell lockup" in the women's facility for her suspected involvement in a series of fire settings in the women's facility. Prior to her reclassification, she was properly afforded the Treatment Team procedure outlined hereinabove. No evidence appears in the record that the Treatment Team procedure was applied in such a fashion as to deprive plaintiff Lavine of a state created liberty interest to remain on medium security status. Plaintiff Lavine was not, therefore, arbitrarily and capriciously deprived of a state created liberty interest without due process of law.

The plaintiff Harley was transferred from maximum security to isolation on February 5, 1975, following Harley's assault on another prisoner. Although Harley was not afforded prior notice and hearing before the transfer to isolation, the court deems that the administrative segregation procedure falls within the due process require-

ments of *Wolff.* The institutional interests at the time of an assault on an inmate to protect the safety of other inmates and guards and to provide security in the facility outweigh the limited intrusion on individual interests which are at a minimum when the individual inmate is involved in endangering the security of the institution.[9]

Within fifteen days after the assault incident, as required under the rules and regulations for administrative transfers to isolation, Harley appeared before the disciplinary committee, which gave him fifteen days' isolation with credit for the time he had served. Harley consistently refused to appear at the regularly scheduled Treatment Team hearings for reclassification of his custody status. Because of his voluntary refusal to participate in the classification hearing procedures, Harley was not deprived of a state created liberty interest without due process of law.

On December 18, 1974, plaintiff Melvin was transferred from the state prison's Community Corrections Center to the isolation unit in the maximum security facility as an escape risk when he returned later than authorized to the Center. During his return to the prison, Melvin attacked one of the escorting prison officers and attempted to escape from the vehicle transporting him to the prison. The court deems that Melvin's transfer to isolation was within the discretion of the prison administrators to administratively segregate those inmates who posed a threat to the security of the institution and to the safety of the other guards and inmates. Melvin appeared before the disciplinary committee on December 26, 1974, in accordance with the procedures established by the prison administration. At the hearing, Melvin indicated that he would not leave isolation. The disciplinary committee therefore did not make a specific recommendation on Melvin's custody classification, and Melvin remained in isolation until January 16, 1975. The prison

---

**9.** *See LaBatt v. Twomey,* 513 F.2d 641, 645 (7th Cir. 1975) ("[W]here prison authorities are allegedly reacting to emergency situations in an effort to preserve the safety and integrity of the institution, the state's interest in decisive action clearly outweighs the inmates' interest in a prior procedural safeguard.").

administration did not arbitrarily apply its classification rules and regulations in a fashion to deprive Melvin of a state created liberty interest without due process of law.

■ Plaintiff Gurule was transferred from the medium security facility to the maximum security facility on July 10, 1974, for his suspected involvement in the killing of an inmate in the medium security facility on that day. Gurule's initial transfer to a maximum security facility was justified as an administrative segregation procedure. Gurule was then transferred to the Salt Lake County Jail isolation unit pending a determination of the murder charges pending against him. On August 6, 1974, Gurule was returned to the maximum security facility at the state prison. Gurule remained in the maximum security facility until March 10, 1975, without any classification hearing.

The prison administration, pursuant to statutory authorization, has created a liberty interest in inmates who are subjected to administrative segregation by providing that they will not be confined in maximum security for more than thirty days without a classification hearing. The prison administration cannot justify failure to provide such a due process hearing on the administrative difficulties that arose in transferring Gurule to the Salt Lake County Jail. The court finds that defendants' arguments that Gurule was like any other pretrial detainee in the Salt Lake County Jail and that Gurule was beyond the jurisdiction or control of the state prison administration are unpersuasive. The evidence does not demonstrate that Gurule could not have been afforded a due process hearing within the thirty days required by the prison's rules on administrative segregation. Gurule was, therefore, deprived of a state created liberty interest to have a classification hearing within thirty days of his administrative segregation to maximum security.

As the preceding individualized analyses indicate, a class action cannot be maintained within the requirements of Rule 23(a) of the Federal Rules of Civil Procedure in light of the court's determination that the classification procedures are fundamentally different from the disciplinary procedures and that the state prison administration's classification rules and regulations do not unconstitutionally deprive the inmates, as a class, of a state created liberty interest to remain in a specific security facility and to receive a pretransfer hearing.

The court therefore concludes that insofar as plaintiffs claim that the state prison's classification procedures violate due process of law by depriving the inmates of a liberty interest without adequate procedural safeguards, the rules and regulations formulated and adopted by the state prison administration are, on their face, constitutionally sufficient. Further, as to plaintiffs Lavine, Melvin, and Harley such rules and regulations, which essentially create state protected interests in liberty within reasonable bounds in the prison system, were not applied in a fashion to deprive those plaintiffs of a state created liberty interest without due process of law. Plaintiff Gurule was deprived of a state created liberty interest to not be confined in maximum security on administrative segregation for more than thirty days without notice and a hearing to determine his continuing custody status. The state prison is therefore enjoined from applying the administrative segregation procedures in a manner that arbitrarily deprives the inmates of a state created liberty interest without due process of law.

### Cruel and Unusual Punishment Claim

■ Plaintiff Lavine contends that her confinement on permanent cell lock-up from October 10, 1974, through March 10, 1975, constituted cruel and unusual punishment. Plaintiff Melvin contends that his confinement in isolation from December 18, 1974, to January 16, 1975, also constituted cruel and unusual punishment. The basic premise of plaintiffs' cruel and unusual punishment claims is that substantively similar procedural safeguards must be guaranteed in the disciplinary and classification contexts because either avenue of institutional control represents a depriva-

tion of the inmate's liberty interest to remain in a particular security facility. Otherwise an inmate may be confined in isolation for classification reasons that are punitively disproportionate to the reasons for his confinement. The court has previously rejected plaintiffs' basic premise that disciplinary and classification procedures are substantively similar and should be subject to similar procedural safeguards. Even assuming that the classification procedures must afford the inmate similar procedural safeguards as the disciplinary proceedings, the court does not find that Lavine's and Melvin's confinement in isolation for classification reasons constituted cruel and unusual punishment as analyzed and explained by this court in *Clements v. Turner*, 364 F.Supp. 270, 278–80 (D.Utah 1973).

### Polygraph Examination in Classification Proceedings

Plaintiff Harley challenges the prison's use of a polygraph examination as a condition to the inmate's progression through the prison's classification system; in Harley's case, the progress from maximum to medium security. The plaintiff contends that submission to such a polygraph examination places him in the dilemma of remaining silent and being penalized for such silence by an inability to be reclassified, or responding to the polygraph examination which may subject him to subsequent criminal prosecution. In light of this court's analysis of the fundamental difference in the nature and purposes of disciplinary and classification proceedings, the court rejects plaintiffs' contention. The evidence does not indicate that the prison officials use polygraph examinations as "fishing expeditions" to uncover possible disciplinary or criminal violations, but such examinations are limited to facts and circumstances that are relevant to classifying the particular inmate. Further, this court must follow the position taken by the Tenth Circuit in *Shimabuku v. Britton*, 503 F.2d 38, 44 (10th Cir. 1974), that protection of an inmate in future criminal prosecutions, who

is testifying in a prison disciplinary hearing or in a classification hearing, "can best be effected at the time of that [future] prosecution."

The court is mindful of the United States Supreme Court's recent emphasis as demonstrated in *Montanye* and *Meachum*, to allow state prison administrators broad discretion in organizing the housing, programs, and other privileges that are necessarily involved in classification procedures, unless state law prescribes or limits the state prison administration's classification alternatives. The role of a federal court is not to oversee all discretionary activities of state prison administrators, particularly where no threat is posed to the inmate's constitutional rights, invoked at the proper time in the criminal process, and in light of the institutional concerns for flexible rehabilitative structuring of inmate classification in state penal systems.

### Use of C-Notes

Plaintiffs challenge the prison administration's practice of recording guards' observations of inmates' behavior in socalled "c-notes," which may be viewed by the Board of Pardons, thereby affecting the prisoner's parole or release date. Plaintiffs claim that the c-notes are unsubstantiated allegations of misconduct against the inmate that cannot be adequately refuted by the inmate in the present classification system, although such c-notes may significantly affect the Board of Pardon's decision on whether to parole or release the inmate on a given date. Defendants argue that the Board of Pardons is statutorily authorized[10] to review all institutional information bearing on the inmate's behavior while in the state penal institution, including "the prisoner's institutional record of behavior, discipline, type and manner of work performed, his own efforts to improve his mental and moral condition, and his attitude toward society." Utah Code Ann. § 77–62–8(b) (1953).

Such broad statutory language clearly contemplates broad discretion in prison ad-

10. Utah Code Ann. §§ 64–9–30, 77–62–8(a), (b) (1953).

ministrators to record an inmate's behavior and to report such behavior to the Board of Pardons. This court declines to interject itself into the process of formulating substantive guidelines for what may or may not be included in c-notes and what information may or may not be presented to the Board of Pardons. Such an effort would constitute impermissible judicial legislation in an area of particular interest to the state. *Cf. Meachum v. Fano*, 427 U.S. 215, 226–229, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

In conclusion, it is the court's judgment that the plaintiffs are not entitled to a declaratory judgment or injunctive relief as to their claims, individually or as a class, of deprivation of liberty without due process of law in the state prison administration's classification proceedings with the exception that, as applied, the prison deprived plaintiff Gurule of a state created liberty interest without due process of law and should be enjoined from any further practice which derogates from the prison's own formulated and adopted classification procedures, including administrative segregation. The court rejects Lavine's and Melvin's claims of cruel and unusual punishment. It is the court's judgment that the plaintiffs are not entitled, individually or as a class, to a declaratory judgment or injunctive relief based upon the state prison administration's use of polygraph examinations in classification proceedings or upon the recording and use of c-notes in classification decisions.

Judgment is therefore entered accordingly.